6

In the Matter of ETTORE I., Respondent, v ANGELA D. et al., Appellants.

Second Department, March 30, 1987

### APPEARANCES OF COUNSEL

*Hal Ian Wolsky* for Angela D., appellant, and *Garamella & Rao (Sylvester Garamella* of counsel), for Robert D., appellant. (One brief filed.)

*Robert J. Gigante (Corash & Hollender [Paul Hollender]* of counsel), for respondent.

*Lenore Gittis (Emily L. Kitay* and *Janet R. Fink* of counsel), *Law Guardian.*

### OPINION OF THE COURT

EIBER, J.

We are asked in the context of this contested paternity proceeding to determine whether the doctrine of equitable estoppel may properly be invoked to prevent the petitioner from securing an order of filiation which would effectively divest a child of her status as the legitimate daughter of the appellants herein.

Erin D., the child whose parentage is at stake in this dispute, was born on August 24, 1981. On or about June 1, 1984, when Erin was approximately two years and nine months of age, the petitioner commenced the instant paternity proceeding contending that he was, in fact, Erin's biological father and that Erin had been conceived during the course of his adulterous affair with the child's mother, the appellant Angela D.

The appellant, Robert D., the husband of the child's mother, steadfastly maintains that Erin is his child. The appellants jointly oppose this paternity proceeding, notwithstanding their legal separation in late 1984. The appellants also have another child, a son, who was born on September 3, 1983.

The paternity petition initially designated the mother, Angela D., as sole respondent. During the course of a preliminary hearing, which was conducted on July 3, 1984, and at which the appellant mother and the petitioner were present, the Family Court, upon consent of the parties, ordered that blood-grouping tests, including the human leucocyte antigen blood tissue test (hereinafter HLA test) be performed on the petitioner, the mother, and the child. Although the appellant mother at that time, and at all times thereafter, denied the petitioner's assertion of paternity, both she and the child submitted to the blood tests. The petitioner likewise participated in the testing. The results of his HLA test, which were

submitted to the court and later introduced into evidence, disclosed a plausibility of paternity score of 99.82%, which was characterized by the laboratory as paternity "practically proved". Thereafter, on August 27, 1984, the Family Court designated the appellant husband a necessary party to this proceeding and, accordingly, directed that he be duly served with all pertinent papers.

The husband's first appearance in this proceeding occurred on October 16, 1984, at which time he declined to voluntarily submit to an HLA test. The court at no time ordered him to do so.

On December 4, 1984, a Law Guardian was assigned to represent the interests of the infant Erin, who at this juncture in the proceedings was three years of age.

Although the issue of the availability of the doctrine of equitable estoppel as a defense to the petitioner's claim of paternity was first alluded to by the appellant husband, it was Erin's Law Guardian who actively pursued and effectively injected this issue into the proceeding. The essence of her argument was that the petitioner should be precluded from asserting any claim of paternity because he had allowed a protracted period of time to elapse before instituting this proceeding and, in the interim, had indirectly promoted or at the very least, acquiesced "in the establishment and growth of the parent-child bond" between Erin and the appellant husband. Moreover, although the petitioner alleged that he was first made aware of his status as Erin's biological parent shortly after she was conceived, the Law Guardian noted that he nevertheless permitted the appellant husband to assume and accept all of the "financial and emotional burdens of child rearing". Therefore, the Law Guardian urged that the court conduct a full hearing to determine whether the petitioner should be estopped from proving paternity by virtue of his delay in commencing this proceeding.

The Family Court (Leddy, J.), in a decision dated February 13, 1985, responded to the Law Guardian's contentions by ordering a fact-finding hearing with respect to the defense of estoppel. The court stated, in pertinent part: "The burden shifts to the petitioner to show why there should not be an estoppel in the best interests of the child, once a requisite showing of operative facts has been made; furthermore, the desireability that the child know its true father is not, standing alone, sufficient to defeat an estoppel defense".

The relevant facts against which we decide this appeal were elicited at this fact-finding hearing.

The petitioner, who was 42 years of age at the time of the hearing, testified that he met the appellant mother in 1980, at her place of employment. Although Mrs. D. was married and was cohabiting with her husband, she and the petitioner nevertheless engaged in sexual relations. They remained intimate until December of 1980 which encompassed the time of probable conception. The petitioner claimed that on one occasion, the appellant mother informed him that she had conceived his child. The petitioner perceived this information to be true, in view of his belief that the marital relationship between appellants had been progressively deteriorating. At no time, however, did Mrs. D. indicate to the petitioner that she had abstained from engaging in sexual relations with her husband during the time of their affair.

So far as the evidence indicates, the petitioner conveyed his desire to be acknowledged as Erin's father; however, the appellant mother refused to allow him visitation. Instead of endeavoring to act upon his rights, the petitioner permitted the appellant husband to assume all parental responsibilities for the child. He attempted to justify his inaction by asserting that he did not wish to upset or otherwise disrupt the family unit. When asked whether he was concerned that the child was forming strong emotional bonds with appellant husband, the petitioner unhesitatingly declared: "there was nothing I could do about it".

It is also relevant to this case that the petitioner admitted that he had fortuitously encountered Erin on only two occasions since her birth: once when she was 15 months old, and again, when she was 2½ years old. On neither of these occasions was there any contact between the petitioner and the child.

The petitioner never attempted to communicate with the appellant husband regarding Erin's paternal origins. Nor did he ever object to the fact that the appellant husband has assumed all parental responsibilities and was designated Erin's father on her birth certificate and when baptismal rites were administered. The petitioner neither paid for nor offered to pay for the medical or hospital expenses incurred in connection with the child's birth. Notwithstanding the foregoing, the petitioner, in an effort to substantiate his asserted concern for the child, referred in his hearing testimony to three checks

which he had given to the appellant mother in the aggregate sum of $324.75. It was subsequently established, however, that of these three checks, only one, in the amount of $25, had been specifically designated for Erin.

At the time of the hearing, the petitioner, a divorced man, was obligated to pay $100 biweekly for the support of his two children. He testified that he had informed his mother, his attorney and his children that Erin was his daughter, despite the fact that there had not yet been any adjudication of paternity.

Immediately prior to the filing of the paternity petition, and after learning that the appellants had separated, the petitioner proposed marriage to Mrs. D. This proposal was, however, rejected. The petitioner explained that he finally decided to institute this proceeding because he wanted to "get to know [his] daughter [and] give her [the] opportunity to get to know [him]". It is significant, however, for purposes of this appeal, that the commencement of the paternity proceeding, from a temporal standpoint, coincided with the petitioner's having acquired information that the appellants had separated. Although the petitioner indicated that he did not believe that the appellants' marriage was intact during the first 15 months of Erin's life, and that he had expected Mrs. D. to leave her husband for 2½ years prior to the hearing, he nevertheless refrained from pursuing any legal remedy at an earlier date because, as he alleged, "I didn't want to see any harm come to the child or the [appellant mother] in bringing it to the attention of the family that the child was mine".[1]

The relevant details of the appellants' case start with the mother's admission that she had engaged in a sexual relationship with the petitioner. She stated, however, that they had utilized a contraceptive device on each occasion of sexual intercourse, except one. Mrs. D. further disclosed that she had also cohabited with her husband at the time Erin was conceived. She believed her husband to be Erin's biological father because the appellants did not use any form of contraceptive during intercourse.

As an integral part of their case, the appellants stressed

---

1. For reasons undisclosed by the record, the petitioner is evidently now of the view that the potentiality of harm to this child has somehow been minimized or obviated by the passage of time. In actuality, the petitioner's inaction for this extended period of time has provided the occasion for Erin and the appellant husband to strengthen their emotional commitment and psychological bond.

that although Mr. D. left the marital residence in January of 1984 he has always provided support for Erin and her brother and he continues to consistently remit support payments pursuant to the parties' separation agreement, which was executed in November of 1984. The appellant husband voluntarily paid for Erin's prekindergarten program and he has unequivocally expressed an intention to support the children for the remainder of his life. The appellant mother attested to the fact that her husband has always been a good father, that he is genuinely concerned about the welfare of the children and that he sees them regularly. She claimed that ever since the results of the HLA test have been made known to her husband, his "attitude toward [Erin] has gotten great", that "he loves her more" and knows "that she'll always be his". Erin, in turn, loves and puts the appellant husband "on a pedestal".

The appellant husband, during the course of his testimony, confirmed his love for Erin. He maintains a close relationship with the child, and she has always referred to him as "Daddy". The results of the HLA test in no way altered his commitment to the child, and he evinced a willingness to continue to support the child both emotionally and financially.

In stark contrast, the petitioner, throughout the 15 months subsequent to Erin's birth, called the appellant mother on only three occasions but never asked to see the child. Other than the $25 check previously referred to, the petitioner, according to the testimony of the appellant mother, never sent any money, nor did he offer to support the child. The appellant mother further testified that the petitioner met Erin on only one occasion. On that occasion, his primary objective was to see the appellant mother; however, she was forced to bring Erin to the meeting site because she was unable to secure the services of a baby-sitter.

Though possessed of this rather compelling factual information, the Family Court, in a decision and order dated August 16, 1985, disposed of the equitable estoppel defense by noting that "[t]he courts have apparently not applied estoppel to a man claiming paternity of a child. Estoppel has only been applied to prevent one from denying paternity after previously claiming it or acquiescing in it" (*Matter of Ettore I. v Angela D.*, 129 Misc 2d 301, 305). While the Family Court indicated that it did "not approve of a putative father, cognizant of a child's existence, sitting back for a prolonged time period before filing a paternity petition" (*Matter of Ettore I. v*

12

*Angela D., supra,* at 305), the petitioner's testimony concerning his reasons for the delay in commencing this proceeding was, nevertheless, found to be credible. Upon these findings plus the additional rationale that there is "no arbitrary cutoff point at which a putative father will be forever barred from asserting his rights" *(Matter of Ettore I. v Angela D., supra,* at 305-306), the Family Court concluded: "To upset an ongoing family unit does strain against public policy. But public policy also favors truth and the facilitation of its ascertainment. It is also to be noted that the paternity Statute of Limitations (Family Ct Act § 517 [c]) allows a putative father until the child's 18th birthday to file a paternity petition. The time period is in no way linked to when the person claiming paternity gained knowledge of the child's existence. On the facts of this case, the court does not find petitioner's delay in coming forward so lengthy or so unwarranted as to merit a finding that public policy precludes petitioner from seeking to establish his paternity" *(Matter of Ettore I. v Angela D., supra,* at 306).

With the equitable estoppel issue thus resolved, the Family Court proceeded to evaluate the evidence supporting the paternity petition and ultimately concluded that the presumption of legitimacy had been overcome in this case. This conclusion eventuated in the entry of an order of filiation in favor of the petitioner. Consideration of the record as a whole, however, compels us to conclude that the petitioner's belated claim of paternity should be barred by the doctrine of equitable estoppel. Accordingly, for the reasons which follow, the order appealed from must be reversed.

We note that, in general, the doctrine of equitable estoppel may successfully be invoked, in the interest of fairness, to prevent the enforcement of rights which would ultimately work fraud or injustice upon the person against whom enforcement is sought *(see, Nassau Trust Co. v Montrose Concrete Prods. Corp.,* 56 NY2d 175, 184). An estoppel defense may also be invoked where the failure to promptly assert a right has given rise to circumstances rendering it inequitable to permit the exercise of the right after a lapse of time *(see,* 57 NY Jur 2d, Estoppel, Ratification, and Waiver, § 27). Because of the same qualitative considerations which support the invocation of estoppel in other areas of law, the courts, in more recent years, have recognized the availability of this doctrine as a viable defense in various forms of proceedings involving domestic disputes.

In *Hill v Hill* (20 AD2d 923), for example, the defense of estoppel was successfully invoked against a mother, who, in the context of a divorce action, attempted to secure custody of her nine-year-old son, by claiming that her husband was not the child's father. Cognizant of the adverse social, legal and psychological ramifications of illegitimatizing children, this court rejected the mother's assertions, noting: "Common sense, public policy, reason and the overriding consideration for the welfare of the child will bar a wife from bastardizing her child where, as here, she lived with her husband as his wife during the period of conception and birth of the child and for six years thereafter—all the while concealing from him the adultery to which she now confesses for the sole purpose of securing the child's custody" *(Hill v Hill, supra,* at 924).

Equally pertinent, although arising in a context somewhat different from the matter at bar are *Matter of Boyles v Boyles* (95 AD2d 95), *State of New York ex rel. H. v P.* (90 AD2d 434) and *Matter of Montelone v Antia* (60 AD2d 603). In each of these cases, utilization of the defense of estoppel effectively thwarted the destruction of an existing parent-child relationship and concomitantly protected the child from the additional stigma of being branded illegitimate. The unequivocal trend and evident purpose of these decisions has been to zealously safeguard the welfare, stability and best interests of the child by rejecting untimely challenges affecting his or her legitimacy.

The efficacy of the doctrine of estoppel, as it applies to paternity proceedings, achieved full recognition in *Matter of Sharon GG. v Duane HH.* (95 AD2d 466, *affd* 63 NY2d 859). In the *Sharon GG.* case, the petitioner, the mother of the child, commenced a paternity proceeding, naming her boyfriend as the child's biological father. She thereafter sought to compel her estranged husband to submit to an HLA test. The Appellate Division, Third Department, upon an appeal by the mother and boyfriend, affirmed the Family Court's order denying the application for the HLA test and its dismissal of the petition on estoppel grounds. Significantly, the court stated: "Estoppel is equally as applicable to a paternity proceeding in Family Court as it was to the divorce actions in the cited cases. In each instance, the purpose of the challenge to the paternity of the mother's husband was to deprive him of his parental rights and status, with a concomitant loss of rights and status for the child * * * the desirability that the child know its true father * * * is not sufficient to overcome

the undisputed equities in the husband's favor nor the benefits to the child accruing by preserving its legitimacy" *(Matter of Sharon GG. v Duane HH., supra,* at 468-469).

The Court of Appeals unanimous adoption of the foregoing analysis *(see, Matter of Sharon GG. v Duane HH.,* 63 NY2d 859, *supra)* reinforces our decision to apply the doctrine of estoppel in this case. Unlike the Family Court, we are not moved to any different determination in this case simply because we are confronted with a putative father who affirmatively seeks to establish his paternity, rather than a spouse who seeks to contest it, as was the situation in each of the cited cases. It would be incongruous, illogical and unrealistic to conclude that a child would be any less devastated by being forced to accept a stranger as her father merely because the stranger initiated the legal proceeding. Analysis of the substantive aspects of the pertinent decisions leads us to the ineluctable conclusion that no jural significance should attach to the fact that this proceeding was commenced by the putative father rather than a spouse. As a practical matter, if there is anything that the body of case law does suggest it is that the paramount concern in this type of case should be the best interests of the child *(see also, Matter of Ronald FF. v Cindy GG.,* 117 AD2d 332; *Golser v Golser,* 115 AD2d 695; *Matter of June B. v Edward L.,* 69 AD2d 612). Indeed, as noted by an eminent authority on filiation proceedings:

"The old conception of paternity proceedings as being designed chiefly to spare the public the expense of supporting the child has been replaced by a more enlightened view. Courts now hold that the chief purpose of the paternity proceeding is to secure the health, welfare and happiness of the child. The best interests of the child have been established as the paramount criteria for determining the relationship between the child and his biological parents. 'There are,' said one court, 'two innocent parties in a paternity proceeding, the child and the public. The principal object is the welfare of the child, the secondary one, that of the public.'

"In their interpretation and application of filiation statutes, the courts should not lose sight of the main purpose of the proceeding which is to secure the health, welfare and happiness of the child born out of wedlock. To achieve this purpose, technicalities must often be avoided so that substantial justice may be done, both for the child and the alleged father. The courts charged with the duty of deciding the case should realize that it is dealing in human values, and not with a

question of mere indemnification to the public" (1 Schatkin, Disputed Paternity Proceedings § 1.09, at 1-48—1-49 [4th ed rev, 1985]).

There can be no doubt, on the record before us, that a reversal of the Family Court's order would best serve Erin's interests. When we reflect upon the emotional fragility of a child of such tender age, and the child's need for continuity, we would be remiss if we failed to note that the inevitable effect of destroying the child's image of her family would be catastrophic and frought with lasting trauma. Moreover, as the child's Law Guardian aptly recognizes in her brief, there is an additional concern—one which is highly pertinent to the case at bar—and that is "an appreciation of the extreme difficulty, if not impossibility, of substituting a stranger for someone who, as a consequence of years of concern and love for a child, has become the 'psychological' parent". Therefore, to meet the need for a just and pragmatic result, the petitioner's efforts to vindicate his rights must give way to the child's emotional well-being as well as the societal interests in shielding the child from the grave repercussions of being branded illegitimate.

Such a conclusion, in concept and in fact, is particularly warranted under the circumstances here extant since the petitioner failed to promptly pursue any legal rights he might otherwise have had during the child's formative years. Throughout the period of the petitioner's inaction, Erin was exposed to and nurtured by the love of the appellant husband. This relationship continues to flourish as a direct consequence of the petitioner's silence and his acquiescence.[2] Although the petitioner testified that he did not attempt to secure an order of filiation at an earlier date, despite his unyielding belief that Erin was his child, because he did not wish to disrupt the harmony of the family, we find the petitioner's assertions to be particularly unconvincing, given his conceded awareness of the marital difficulties which the appellants were experiencing at the time of Erin's conception and throughout the period of time thereafter. Moreover, the veracity of his excuse is further undermined by the fact that he had apparently engaged in a lengthy campaign to persuade the appellant mother to leave her husband. The petitioner also candidly admitted that he

2. Necessarily implicated in this discussion is the relationship between Erin and her younger brother, a relationship which would, no doubt, be adversely affected by an order of filiation in favor of the petitioner.

never thought the appellants' marriage would survive. He finally commenced this proceeding only after his proposal of marriage was rejected by the appellant mother. Based on the foregoing, we cannot help but wonder if the petitioner is truly attempting to vindicate his rights as a biological father or if he is merely attempting to be vindictive. We do know that the reality of what the petitioner seeks to do is to deprive Erin of the only father she has ever known and to place a stranger in his stead. We conclude, however, that the petitioner has not made a showing "sufficient to overcome the undisputed equities in the husband's favor nor the benefits to the child accruing by preserving its legitimacy" *(see, Matter of Sharon GG. v Duane HH.,* 95 AD2d 466, 469, *supra).* The excuse proffered by the petitioner, in an attempt to justify his delay, is patently insufficient to defeat the defense of estoppel, for any party against whom the doctrine is invoked could claim inaction out of a desire to protect existing relationships. Acceptance of such a self-serving excuse would be fundamentally inconsistent with the purpose of estoppel, which is to protect innocent children from an irreparable loss of legal rights and status and to protect the rights of unsuspecting persons who have developed strong bonds with the child during the period of inaction. Moreover, were we to sanction the petitioner's conduct, the defense of estoppel would be rendered substantially meaningless and the innocent victims of belated challenges to paternity would be deprived of any protection under the law. In accordance with this analysis, the order appealed from must be reversed and the proceeding dismissed.

In light of the foregoing disposition, the parties' remaining contentions need not be addressed.

WEINSTEIN, J. P., RUBIN and SPATT, JJ., concur

Ordered that the order is reversed, with one bill of costs, and the proceeding is dismissed.