## Mark A. Godin v. Rita Godin

[725 A.2d 904]

No. 97-147

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed December 24, 1998

*Timothy J. Ryan* of *Brown, Cahill, Gawne & Miller*, St. Albans, for Plaintiff-Appellant.

*Rita Godin*, pro se, Enosburg, Defendant-Appellee.

**Morse, J.** The question presented is whether, six years after a final divorce decree and adjudication of paternity, a father may disavow a child born during the marriage and presumed for fourteen years to have been his. We hold that he may not.

The family court denied plaintiff Mark Godin's motion to require genetic testing to determine the paternity of Christina, the child born while he was married to his former wife Rita Godin, and dismissed his complaint seeking to set aside a child support order. Plaintiff contends the court erred in concluding that the adjudication of paternity implicit in the final divorce decree was res judicata and barred relitigation. We affirm.[1]

The material facts are largely undisputed. Mother and plaintiff shared a sexually intimate relationship in Vermont during the Summer of 1981, while plaintiff was on leave from military service. On July 15, plaintiff returned to his station in South Carolina. Subsequently, mother told plaintiff she was pregnant when he returned to Vermont in November, and they were married in December 1981. Mother gave birth to Christina on May 18, 1982. Mother filed for divorce in 1989. In her complaint she stated that there was one child, Christina, born of the marriage. A final uncontested divorce hearing

---

[1] Plaintiff's motion to strike from the record portions of mother's brief as well as previously unfiled documents is granted pursuant to V.R.A.P. 10(a).

was held in April 1990, at which both parties were present. The court adopted the parties' stipulation, and a final order was issued in May 1990. Under the terms of the final divorce order, mother was awarded custody and plaintiff was required to pay child support.

In the Fall of 1996, approximately six years after the divorce became final, rumors within his family led plaintiff to suspect that he was not Christina's biological father. He then reconsidered his earlier relationship with mother and concluded he must not be the father because ten months had elapsed between Christina's alleged conception and her birth. As a result, he filed a pro se motion for genetic testing with the family court. The court denied the motion, ruling that the test should have been requested before the divorce became final. Plaintiff then retained counsel and filed a complaint seeking relief from judgment based on fraud upon the court. See V.R.C.P. 60(b). As part of this action, plaintiff requested that the court order genetic testing and vacate those provisions of the divorce order referring to him as the father of Christina and requiring him to pay child support.

A hearing was held in March 1997. Plaintiff testified that until the Fall of 1996, he believed Christina was his biological child and treated her as such. He explained that he questioned his paternity only after Christina began asking him if he was her biological father. Mother testified that she was sexually intimate with another man prior to the marriage while plaintiff was in South Carolina. She also testified that when she informed plaintiff that she was pregnant, she "never stated who was the father and who wasn't." In addition, she denied ever telling any of plaintiff's relatives that plaintiff was not Christina's biological father. Finally, she stated that although she was not opposed to genetic testing, she was concerned about the impact such testing would have on her then fifteen-year-old daughter who "has always thought that [plaintiff] is her father."

The court appointed a guardian ad litem to represent Christina's interests, and reset the hearing for April 1, 1997. At the April 1 hearing, plaintiff objected to the intended testimony of the guardian ad litem on grounds that her testimony would relate hearsay evidence and would introduce an irrelevant subject matter, namely, Christina's feelings about genetic testing. The court declined to hear testimony from the guardian ad litem and held that plaintiff's request for genetic testing was time-barred. The court reasoned that plaintiff had an opportunity to contest paternity in the original divorce proceeding or on appeal, and that his failure to do so precluded him from challenging paternity at a later date. Accordingly, the court concluded

that plaintiff's motion to modify child support, and his independent action of fraud upon the court, were moot. This appeal followed.

Plaintiff contends that mother perpetrated a fraud upon the court during the divorce proceedings by alleging in her complaint that Christina was biologically her husband's and, because of such fraud, the trial court should set aside any obligation to pay child support.

We agree with the trial court that both of plaintiff's claims involve the same underlying issue: the conclusiveness of paternity findings and implications in a divorce judgment. We have previously addressed this issue. See *Lerman v. Lerman*, 148 Vt. 629, 629, 528 A.2d 1121, 1122 (1987) (mem.). In *Lerman*, we held that a former husband was not entitled to court-ordered genetic testing approximately ten years after his divorce became final. See *id*. We reasoned that where no issue concerning paternity was raised during a divorce proceeding and no appeal was taken from the divorce action contesting paternity, the doctrine of res judicata precluded a relitigation of paternity. See *id*. Plaintiff's appeal implicitly requires us to reconsider our holding in *Lerman*.

V.R.C.P. 60(b) governs the granting of relief from judgment. Rule 60 is "substantially identical" to its federal counterpart, Fed. R. Civ. P. 60. See Reporter's Notes, V.R.C.P. 60. Under this rule, a court may grant relief from a final judgment for "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)" or for "fraud . . . misrepresentation, or other misconduct of an adverse party." V.R.C.P. 60(b)(2), (3). Plaintiff's claim seems to be premised on two facts: mother's alleged ten-month gestation period, and another sexual partner. This "newly discovered evidence" and mother's failure to disclose it before their marriage constitutes the alleged fraud. As expressly stated in the rule, however, a motion for relief from judgment based on either of these grounds must be made within one year after the judgment was entered. Plaintiff filed his motion for relief from judgment approximately six years after the date of the judgment. Thus, he was not entitled to relief under Rule 60(b)(2) or (3).

Apparently realizing that his claim is time-barred and thus not cognizable under the above provisions, plaintiff contends that these subsections are not controlling. Instead, he contends that mother's alleged fraud was committed "upon the court" and therefore is not subject to the same one year statute of limitations. Based on this characterization, plaintiff's claim is governed by the catch-all provision of Rule 60(b)(6), which provides that relief may be granted for

"any other reason justifying relief from the operation of the judgment." The rule explicitly provides that motions based on the catch-all provision "shall be made within a reasonable time." V.R.C.P. 60(b). The rule also states that there is no limit to "the power of a court to entertain an independent action to relieve a party from a judgment . . . or to set aside a judgment for fraud upon the court." *Id.*

As we explained in *Levinsky v. State*, 146 Vt. 316, 318, 503 A.2d 534, 536 (1985), "the independent action clause in Rule 60(b) simply preserves the historical authority of the courts of equity to reform judgments in *special circumstances.*" (emphasis added) (internal quotation marks omitted). "However, this catch-all provision is available only when a ground justifying relief is not encompassed within any of the first five classes of the rule." *Id.* at 317, 503 A.2d at 536 (internal quotation marks omitted).

The first issue, then, is whether the fraud alleged here may properly be characterized as a fraud upon the court and therefore exempt from the one-year statute of limitations. We conclude that to the extent mother's conduct was fraudulent, if at all, it constituted fraud upon plaintiff, not upon the court. The seminal decision in this area is *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944). There, an attorney for the Hartford-Empire Glass Company fabricated an article, claimed it was authored by a former president of the Glass Workers' Union, and later used the falsified article in a patent case before an appellate court to receive a favorable judgment. The United States Supreme Court characterized the fraud as "a wrong against the institutions set up to protect and safeguard the public," *id.* at 246, distinguishing it from the "case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury." *Id.* at 245. The Court described the fraud upon the court by the attorney as "manifestly unconscionable," *id.* at 244-45 (internal quotation marks omitted), and "a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals." *Id.* at 245-46. This "tampering with the administration of justice," the Court concluded, justified its exercise of equitable power to set aside the "fraudulently begotten judgment[]." *Id.*

Since *Hazel-Atlas*, courts and commentators alike have observed that the fraud-on-the-court doctrine must be narrowly applied, or it would become indistinguishable from ordinary fraud, and undermine the important policy favoring finality of judgments. "If fraud on the

court were to be given a broad interpretation that encompassed virtually all forms of fraudulent misconduct between the parties, judgments would never be final and the time limitations of Rule 60(b) would be meaningless." 12 J. Moore, et al., *Moore's Federal Practice* ¶ 60.21[4][c], at 60-55 (3d ed. 1997). Thus, the doctrine has generally been reserved for only the most egregious misconduct evidencing, as in *Hazel-Atlas*, an unconscionable and calculated design to improperly influence the court. See, e.g., *Wilson v. Johns-Manville Sales Corp.*, 873 F.2d 869, 872 (5th Cir. 1989) (fraud on the court requires showing of unconscionable plan or scheme designed to improperly influence court in its decision). As one federal court has explained, the narrow fraud-on-the-court concept should "'embrace only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases.'" *Kerwit Med. Prods., Inc. v. N. & H. Instruments, Inc.*, 616 F.2d 833, 837 (5th Cir. 1980) (quoting 7 Moore, Federal Practice ¶ 60.33, at 515 (1971 ed.)). As another court has observed: "'A finding of fraud on the court is justified only by the most egregious misconduct directed to the court itself, such as . . . fabrication of evidence by counsel, and must be supported by clear, unequivocal and convincing evidence.'" *Nichols v. Klein Tools, Inc.*, 949 F.2d 1047, 1048 (8th Cir. 1991) (quoting *Pfizer, Inc. v. International Rectifier Corp.*, 538 F.2d 180, 195 (8th Cir. 1976)).

Judged in the light of this standard, mother's conduct in this case cannot reasonably be characterized as a fraud on the court. The primary basis of plaintiff's fraud allegation is mother's attestation in her divorce complaint that Christina was "born of [the] marriage." The wording was not mother's, but rather was contained in the preprinted complaint form, and merely signified that the child was born while the parties were legally married. From this fact, the law presumes that the parties are the child's natural parents. See 15 V.S.A. § 308(4) (Cum. Supp. 1998) (alleged parent shall be rebuttably presumed to be natural parent if child is born while husband and wife are legally married); see also *Cicero v. Cicero*, 395 N.Y.S.2d 117, 117 (App. Div. 1977) (presumption of legitimacy attached to "issue of the marriage"); *Orange v. Rose*, 295 N.Y.S.2d 782, 783 (App. Div. 1968) ("offspring of the marriage" were entitled to presumption of legitimacy); *Best v. L.J.F. Corp.*, 246 N.Y.S.2d 791, 792 (App. Div. 1964) (issue "born of this marriage" are presumed legitimate). Thus, there was nothing fraudulent about mother's representation that Christina

was born of the marriage. The law supplied the presumption that plaintiff was the child's natural parent; mother did not make that affirmative representation.

■ The real thrust of plaintiff's fraud-on-the-court claim is that mother failed to disclose certain facts during the divorce proceedings, namely, that she had sexual relations with another man sometime after plaintiff returned to military duty, and that Christina was born some ten months after plaintiff's last sexual encounter with mother. As a number of courts have observed, "'the mere nondisclosure to an adverse party and to the court of facts pertinent to a controversy before the court does not add up to "fraud upon the court" for purposes of vacating a judgment under Rule 60(b).'" *Wilson*, 873 F.2d at 872 (quoting *Kerwit Med. Prods.*, 616 F.2d at 837). Furthermore, many pregnancies do, in fact, extend longer than the average gestation period, and periods of 42 weeks or longer are not unknown. See 5 Lawyer's Medical Cyclopedia § 37.2a (R. Patterson ed., 4th ed. 1998) (three percent of women deliver 300 days or more past first day of last menstrual period). Thus, the nondisclosures in this case did not approach the kind of calculated, egregious "defiling" of the adjudicative process that has traditionally characterized fraud on the court. See *Great Coastal Express, Inc. v. International Bhd. of Teamsters*, 675 F.2d 1349, 1356 (4th Cir. 1982) (fraud on court must "defile the court itself").

The second and more important issue is whether the facts of this case present "special circumstances" that warrant the exercise of the court's equitable jurisdiction, despite the lapse of time and despite our previous application of the doctrine of res judicata in *Lerman*. After all, issues concerning parental rights and responsibilities are of the utmost importance and do not always lend themselves readily to rigid legal rules. We have previously addressed the court's authority arising from the independent action clause of Rule 60(b):

> This power has been and must continue to be exercised guardedly, as it carries with it an inevitable clash of two competing principles of judicial administration: the principle of finality and repose of judgments, which is so fundamental to our system of justice, and the ultimate principle that justice must be done unto the parties.

*Levinsky*, 146 Vt. at 318, 503 A.2d at 536-37 (internal citations omitted). The essential elements of an independent action under Rule 60(b) are as follows:

(1) a judgment which ought not, in equity and good conscience, to be enforced; (2) a good defense to the alleged cause of action on which the judgment is founded; (3) fraud, accident, or mistake which prevented the defendant in the judgment from obtaining the benefit of his defense; (4) the absence of fault or negligence on the part of the defendant; and (5) the absence of any adequate remedy at law.

*Id.* at 319, 503 A.2d at 537.

Although plaintiff here alleges that mother fraudulently failed to disclose the ten-month gestation period, he offers no plausible reason why he would have been unaware of the relevant dates prior to the divorce, and thus on inquiry notice of at least some irregularity. Plaintiff asserts that nondisclosure of the ten-month period constituted a fraudulent omission of material fact. Accordingly, he can hardly claim that he was unaware of the significance of the dates and therefore excused from taking action. While not dispositive, plaintiff's failure to raise the issue prior to the final divorce order certainly undermines his claim that "equity and good conscience" require us to void the judgment. See *N.C. v. W.R.C.*, 317 S.E.2d 793, 796-97 (W. Va. 1984) (father's negligence in not raising paternity issue prior to final disposition of divorce precluded independent action challenging paternity).

Even more compelling, in our view, are the fundamental policy concerns that require finality of paternity adjudications.[2] It is noteworthy that Vermont statutory law raises a rebuttable presumption of parentage where, as here, "the child is born while the husband and wife are legally married to each other." 15 V.S.A. § 308(4) (Cum. Supp. 1998). The presumption of parentage originated in the common law, which established that "'a child born of a married woman was conclusively presumed to be legitimate unless her husband was not within the four seas which bounded the kingdom.'" *Miscovich v. Miscovich*, 688 A.2d 726, 729 (Pa. Super. Ct. 1997) (quoting *Common-*

---

[2] There was no question that paternity "was *necessarily* determined in the original divorce proceeding, which granted an award of child support." *Slansky v. Slansky*, 150 Vt. 438, 441 n.1, 553 A.2d 152, 153 n.1 (1988) (construing our holding in *Lerman*). A finding of paternity is a necessary predicate to an ex-husband's child support obligation. Moreover, a survey of other jurisdictions reveals that the overwhelming weight of authority holds that a divorce decree is an adjudication of the paternity of a child of the marriage. See, e.g., *Anderson v. Anderson*, 552 N.E.2d 546, 550-51 (Mass. 1990); *Hackley v. Hackley*, 395 N.W.2d 906, 907-08 (Mich. 1986); *DeVaux v. DeVaux*, 514 N.W.2d 640, 644 (Neb. 1994); *Commonwealth ex rel. Coburn v. Coburn*, 558 A.2d 548, 551 (Pa. Super. Ct. 1989).

*wealth ex. rel. Goldman v. Goldman*, 184 A.2d 351, 354 (Pa. Super. Ct. 1962)). The presumption of paternity has been described as "'one of the strongest and most persuasive known to the law.'" *Richard B. v. Sandra B.B.*, 625 N.Y.S.2d 127, 129 (App. Div. 1995) (quoting *In re Findlay*, 170 N.E. 471, 472 (N.Y. 1930)); see also *A.G. v. S.G.*, 609 P.2d 121, 124 (Colo. 1980) (presumption of paternity is "one of the strongest presumptions known to the law").

Protecting innocent children from the social burdens of illegitimacy, ensuring their financial and emotional security, and ultimately preserving the stability of the family unit all contributed to the origins of the parental presumption, and all help to explain its enduring power today. See *Michael H. v. Gerald D.*, 491 U.S. 110, 125 (1989) (in addition to avoidance of illegitimacy, presumption of paternity prevented children from becoming wards of state and preserved stability of families); *A.G.*, 609 P.2d at 124 (public policy underlying presumption of paternity is to prevent unnecessary litigation and disruption of family relations); *Ettore I. v. Angela D.*, 513 N.Y.S.2d 733, 739 (App. Div. 1987) (presumption of paternity preserves child's need for continuity of family relationships); *Michael K.T. v. Tina L.T.*, 387 S.E.2d 866, 871-72 (W. Va. 1989) (defeat of parental presumption would result in undeniable financial and psychological harm to child). Indeed, the presumption of paternity has assumed even greater significance today, as alternative methods of conception unrelated to the "biology" of the presumed parent have become more common. See *In re B.L.V.B.*, 160 Vt. 368, 376, 628 A.2d 1271, 1276 (1993).

Thus, the State retains a strong and direct interest in ensuring that children born of a marriage do not suffer financially or psychologically merely because of a parent's belated and self-serving concern over a child's biological origins. These themes underlie the conclusion, reached by numerous courts, that the public interest in finality of paternity determinations is compelling, and that the doctrine of res judicata therefore bars subsequent attempts to disprove paternity. See, e.g., *Hackley v. Hackley*, 395 N.W.2d 906, 913-14 (Mich. 1986) (best interests of child in maintaining stability and preventing psychological trauma must prevail over any unfairness to father resulting from denial of challenge to paternity nine years after judgment of divorce); *Richard B.*, 625 N.Y.S.2d at 130 ("unequivocal trend . . . has been to zealously safeguard the welfare, stability and best interests of the child by rejecting untimely challenges affecting his or her legitimacy") (quoting *Ettore I.*, 513 N.Y.S.2d at 738); *JRW*

& *KB v. DJB*, 814 P.2d 1256, 1265 (Wyo. 1991) ("Because of the potentially damaging effect that relitigation of a paternity determination might have on innocent children, the doctrines of res judicata and collateral estoppel are rigorously observed in the paternity context.").

As the Supreme Court of Michigan observed in a case factually similar to the case at bar:

> [E]ven if we were inclined to adopt the position . . . that res judicata sometimes does not bar relitigation of a factual determination decided in a prior case, we would not adopt the exception here. We believe that the best interests of this child, and all children whose rights will be implicated by the Court's decision today, must prevail over any unfairness that may result to this [former husband] by denying his challenge of paternity raised nine years after entry of his judgment of divorce.

*Hackley*, 395 N.W.2d at 913. Thus, many other jurisdictions have rejected similar attempts to reopen paternity judgments based on post-judgment blood tests or other evidence, absent clear and convincing evidence that it serves the best interests of the child. See *Tandra S. v. Tyrone W.*, 648 A.2d 439, 449 (Md. 1994) (collecting cases); *JRW*, 814 P.2d at 1266-67 nn.6-7 (collecting cases).

Although we understand plaintiff's interest in ascertaining the true genetic makeup of the child, we agree with the many jurisdictions holding that the financial and emotional welfare of the child, and the preservation of an established parent-child relationship, must remain paramount. Where the presumptive father has held himself out as the child's parent, and engaged in an ongoing parent-child relationship for a period of years, he may not disavow that relationship and destroy a child's long-held assumptions, solely for his own self-interest. See *Ettore I*, 513 N.Y.S.2d at 740 (holding father's "self-serving" effort to disavow paternity to be inconsistent with policy of protecting innocent children from irreparable loss of financial security and paternal bonds). Whatever the interests of the presumed father in ascertaining the genetic "truth" of a child's origins, they remain subsidiary to the interests of the state, the family, and the child in maintaining the continuity, financial support, and psychological security of an established parent-child relationship. Therefore, absent a clear and convincing showing that it would serve the best

interests of the child, a prior adjudication of paternity is conclusive. See *A.K. v. S.K.*, 624 A.2d 36, 40-42 (N.J. Super. Ct. App. Div. 1993).

Here, plaintiff lived with Christina, as her father, for the first eight years of her life. Although he had the opportunity, plaintiff did not raise the issue of paternity during the divorce proceedings, and he continued to treat Christina as his child for six years thereafter, lending her parental guidance and support. It is thus readily apparent that a parent-child relationship was formed, and it is that relationship, and not the results of a genetic test, that must control. We perceive no basis in this case to relieve plaintiff of the prior adjudication of paternity, and all of its attendant legal and financial responsibilities.[3]

The dissent contends that mother committed a fraud on the court by affirmatively misrepresenting plaintiff's paternity in the divorce complaint, in the stipulation incorporated into the divorce decree, and in her testimony under oath. As noted, however, the divorce complaint did not contain a false representation of plaintiff's paternity, but only the accurate statement that Christina was born of the marriage. The alleged misrepresentation in the parties' stipulation concerned child custody, not paternity, and stated only that mother "is awarded the legal and physical responsibilities of the parties minor child." This was hardly an unequivocal representation of plaintiff's paternity. Finally, we are hard pressed to conclude that mother made fraudulent misrepresentations under oath when, as the dissent notes, the transcript of her testimony is not before us.

Citing several sister-state decisions, the dissent also argues that the stringent standards for a finding of fraud on the court should be relaxed in the family-law context because the state is an integral party. We are not persuaded, however, that the state's interest in the welfare of children requires that post-judgment attacks on paternity should be made easier. On the contrary, the state's concern is to ensure that children's lives remain stable and secure, and this militates, if anything, against the liberal reopening of paternity determinations.

The dissent also argues that a finding of fraud on the court is compelled by our prior decisions in *In re Goodrich*, 111 Vt. 156, 11

---

[3]This is not a case where a third party is seeking to *establish* paternity and assume support of the child, or where support is being sought from a third-party putative father. A finding of nonpaternity in this case would essentially leave the child without the benefit of a father-child relationship, and the economic and emotional well-being that accompanies it. Cf. *M.F. v. N.H.*, 599 A.2d 1297, 1297 (N.J. Super. Ct. App. Div. 1991).

A.2d 325 (1940), and *Blondin v. Brooks,* 83 Vt. 472, 76 A. 184 (1910). *Goodrich,* however, involved a lawyer who knowingly filed a false complaint and misrepresented facts to the court, and falls squarely within the category of fraud-on-the-court "perpetrated by officers of the court." *Kerwit Med. Prods.,* 616 F.2d at 837. *Blondin* is also inapposite. There, the Court refused to give conclusive effect to a New Mexico divorce judgment obtained by the wife, a Vermont resident, after her original divorce complaint in Vermont had been dismissed. The husband had failed to appear and defaulted in the New Mexico proceedings. Although the *Blondin* Court found that the wife had committed a fraud by failing to disclose to the New Mexico authorities her intent to return to Vermont, the real basis of the holding was the Court's reluctance to give effect to such "quickie" foreign divorces (this was before no-fault divorce) at the expense of the spouse domiciled in Vermont. See *Blondin,* 83 Vt. at 484, 76 A. at 189 (Constitution "does not debar other states from giving such effect to a decree of that character as they may elect to do").

The dissent argues that the policies favoring finality are archaic and counterproductive, and that barring a relitigation of paternity cannot perpetuate a parent-child relationship against a parent's will. Obviously not. The fact that plaintiff chose for self-serving purposes to jeopardize his relationship with Christina is beyond our control. We need not, however, award plaintiff a financial windfall for his conduct, or deprive Christina of not only a father's affection, but also the legal rights and financial benefits of the parental relationship. See *Michael K.T.,* 387 S.E.2d at 872 ("While the law cannot prohibit the putative father from informing the child of their true relationship, it can prohibit him from employing the sanctions of the law to avoid the obligations which their assumed relationship would otherwise impose."). The dissent's assertion to the contrary notwithstanding, the real "victim" in this case is not Mark Godin, but his innocent daughter Christina.

Finally, our ruling in this case will help deter other parents who might otherwise seek, for financial or other self-serving reasons, to dissolve their parental bonds. See *Ettore I.,* 513 N.Y.S.2d at 740 (were court to sanction father's denial of paternity, "innocent victims of belated challenges to paternity would be deprived of any protection under the law"). Far from representing archaic interests, these policy concerns are more signficant today than ever before, as family structures become more fluid and the means of conception become

ever more varied. Nor, finally, does our ruling prevent an interested child from later attempting to ascertain the identity of the child's biological father. See 15 V.S.A. § 302(b) (action to establish parentage may be brought by child up to age of twenty-one).

■ For all of the foregoing reasons, therefore, we conclude that the policy interests underlying our decision in *Lerman* remain valid and controlling. The trial court correctly denied plaintiff's request for genetic testing and for relief from judgment.

*Affirmed.*

**Dooley, J.,** dissenting. One night in September of 1996, defendant's teenage daughter Christina Godin called plaintiff and said that children at her school were telling her that he was not her father. This was plaintiff's first notice of what is now undisputed, that plaintiff is not the biological father of Christina. The truth came out fully only after Christina wrote notes to various of her relatives asking whether plaintiff was her father, and defendant finally admitted he was not to plaintiff's sister and apparently to Christina.

Because plaintiff believes there should be legal consequences stemming from the true facts, which had been withheld from him for fifteen years, he is labeled by the majority as disavowing his relationship with Christina and destroying her "long-held assumptions, solely for his own self-interest." I take it the majority is making this accusation, so at variance with the actual facts of the case, to suggest its result is just and consistent with the public interest. To the contrary, the undisputed facts demonstrate that, at its core, this is a classic case of defending an unjust result by blaming the victim. Accordingly, I dissent.

I accept the majority's statement of the facts, with the proviso that we must assume the validity of *all* assertions in plaintiff's complaint and accompanying affidavit because the family court made no findings, ruling that defendant was entitled to judgment as a matter of law irrespective of the facts. See *Thayer v. Herdt*, 155 Vt. 448, 456, 586 A.2d 1122, 1126 (1990) (holding that, when awarding judgment on the pleadings, trial court must accept well-pleaded facts alleged by nonprevailing party). Hence the inclusion, at the outset of my opinion, of certain additional circumstances alleged by plaintiff but omitted by the majority. I further note that, although plaintiff has sought a paternity test, that step is really unnecessary because defendant has not denied plaintiff's assertion that he is not Christina's father and

has admitted she was sexually active with another man after plaintiff returned to military duty in July 1981.*

The majority leads off with the assertion that we have already held that a father cannot prevail in these circumstances in *Lerman v. Lerman*, 148 Vt. 629, 629, 528 A.2d 1121, 1122 (1987), and that plaintiff is asking us to overrule that memorandum decision. This is an overstatement of *Lerman*, which holds only that res judicata applies to paternity adjudications and prevents relitigation when the matter should have been litigated in the divorce. *Id.* at 629, 528 A.2d at 1122. In filing his complaint to reopen the judgment based on fraud on the court, plaintiff accepted that res judicata applied, but alleged that grounds for reopening a judgment existed because of defendant's fraud on the superior court in 1990. Unless paternity judgments are somehow immune from reopening based on grounds applicable to any other judgment, plaintiff is actually invoking, not warring with, *Lerman*.

As the majority recognizes, V.R.C.P. 60(b) establishes two alternative procedures for obtaining relief from a judgment: (1) a motion for relief under the rule, and (2) an independent action, including an independent action "to set aside a judgment for fraud upon the court." Reporter's Notes, V.R.C.P. 60. The majority concludes, however, that although defendant's actions may have been a fraud on plaintiff, they were not a fraud on the court. This conclusion ignores our settled law on this subject.

I agree that we should look initially to Federal Rule of Civil Procedure 60(b), especially as interpreted by *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944). The key test under *Hazel-Atlas* is whether the fraud affects only the parties before the court or, alternatively, "far more than an injury to a single litigant." *Id.* at 246. Thus, the fraud must involve a "direct assault on the integrity of the judicial process." 11 C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2870, at 416 (2d ed. 1995).

What I do not accept is that commercial law decisions from federal courts involving corporate parties have much to tell us about applying the principles of *Hazel-Atlas* to family proceedings. Far more rele-

---

*For this reason, I attribute no significance to the fact that defendant gave birth to Christina over nine months after her last act of intercourse with plaintiff before he returned to military duty. If there were a serious dispute over paternity, this fact might support either side. I do not believe it would be determinative, however, because, as the majority states, it is not uncommon for the human gestation period to exceed nine months.

vant is the observation of the Minnesota Supreme Court that a narrow definition of fraud on the court "has no place in family law" where the court "sits as a third party." *Maranda v. Maranda*, 449 N.W.2d 158, 165 (Minn. 1989). Thus, other courts have found fraud on the court in cases comparable to that before us. See, e.g., *In re M.E.*, 622 N.E.2d 578, 583 (Ind. Ct. App. 1993); *In re Tompkins*, 518 N.E.2d 500, 506-07 (Ind. Ct. App. 1988); *Cain v. Cain*, 777 S.W.2d 238, 239 (Ky. 1989).

Because of the broad public interest involved in divorce proceedings, we have made essentially the same point as the Minnesota court, noting that "the state is virtually a party." *Siebert v. Siebert*, 124 Vt. 187, 192, 200 A.2d 258, 261 (1964). Unlike the complaint in most other cases, a divorce complaint must be signed under oath by the plaintiff. See V.R.F.P. 4(b)(1)(A). Even if uncontested, the divorce action must be heard by the court. See V.R.F.P. 4(d). The court must make findings and is not bound in doing so by uncontradicted testimony. See *Davis v. Davis*, 128 Vt. 495, 497, 266 A.2d 466, 468 (1970).

Again because of the public interest involved, this Court has held that presenting a false complaint in a divorce, or using false testimony to obtain a divorce, is a fraud upon the court. In *In re Goodrich*, 111 Vt. 156, 11 A.2d 325 (1940), a lawyer presented to the court a divorce complaint which, because recrimination then barred a divorce, stated that plaintiff had faithfully performed her marital covenants. The lawyer knew that the plaintiff had been convicted of adultery when he filed the complaint. We suspended the lawyer from the practice of law for one year because of this misconduct, finding that it represented a fraud upon the superior court. *Id.* at 159-60, 11 A.2d at 326-27. Similarly, we held in *Blondin v. Brooks*, 83 Vt. 472, 486, 76 A. 184, 189-90 (1910), that misrepresenting residency in order to obtain a divorce was a fraud on the court.

The majority seeks to distinguish *Goodrich* on the basis that the fraud there was attributable to the lawyer. The majority is arguing that a party, who knowingly signs a false pleading under oath, does not commit a fraud on the court, while a lawyer who delivers that pleading to the court does commit such a fraud. I find this distinction illogical since both involve fraud and the effect "on the court" are the same. Nothing in *Goodrich* suggests that this Court drew such an illogical distinction.

The attempt to distinguish *Blondin* is more curious. The majority does not dispute that this Court found that obtaining a foreign divorce by a misrepresentation of residency is a fraud on the foreign court

such that this Court does not have to recognize the divorce. I believe that this is the real holding of the case and fail to understand the relevancy of the majority's further suppositions as to the *Blondin* Court's underlying motivation. Under any view of the Court's motives, the holding on fraud on the court is entitled to stare decisis effect here. In fact, the majority has sub silentio overruled *Goodrich* and *Blondin* because it disagrees with them, and not because they can be distinguished.

Rather than overruling these cases, we should recognize that the force of *Blondin* and *Goodrich* is even greater when the issue involves children. The "court embodies the public's paramount interest in the care and maintenance of the[] children" before it in a divorce. *White v. White*, 141 Vt. 499, 503, 450 A.2d 1108, 1110 (1982). Thus, the "duty and first obligation" of the court is to consider the welfare of the children, and it is not bound by any agreements of the parties in doing so. *Frink v. Frink*, 128 Vt. 531, 534, 266 A.2d 820, 822 (1970). A misrepresentation of paternity makes it impossible for the court to discharge properly its "duty and first obligation."

I think it is beyond question that defendant perpetrated a fraud upon the superior court. She signed under oath a divorce complaint stating that Christina was born of the marriage between plaintiff and defendant and requested that defendant be ordered to pay child support for Christina. Although we do not have her divorce testimony before us, it is very likely that she continued this fraudulent misstatement in her testimony, again under oath. She signed a stipulation that Christina was the "parties' minor child," knowing that to be false, in order to induce the court to issue a child support order against plaintiff.

The majority has responded that defendant was technically accurate in the pleading because "born of the marriage" actually means "born during the marriage," that defendant's statement in the stipulation was equivocal, and that we do not know what defendant actually said in her divorce hearing. Quite apart from the regrettable inducement to sharp pleading represented by such a reading of plaintiff's divorce complaint — an invitation that is particularly unfortunate in the context of family court proceedings where the welfare of children is at issue — the majority confuses the application of a rebuttable evidentiary presumption, see discussion *infra*, with the more straightforward process of understanding the actual words that appear in the divorce complaint. No credible theory of language interpretation would accommodate the metamorphosis of "born of the

marriage" into "born during the marriage." Regardless of the legal presumption that children born to a married woman are the offspring of the woman and her husband, I doubt any one reading the words in the divorce complaint would regard them as anything other than a statement that Mark Godin is the father of Christina Godin. Indeed, the majority's constant insistence that the divorce decree is res judicata as to plaintiff's paternity is undermined by its holding that defendant never asserted that plaintiff was the biological father of Christina.

I have the same reaction to the claim that defendant did not commit fraud in signing the stipulation. There is nothing equivocal about a statement that Christina is the "parties' minor child," whatever was the purpose of the stipulation. Of course, plaintiff might have brought out more about the nature of defendant's representations if his claim had not been dismissed before any factual development.

The majority has also determined that the paternity adjudication inherent in the divorce cannot be reopened because "absent a clear and convincing showing that it would serve the best interests of the child, a prior adjudication of paternity is conclusive." I assume this is a throw-away line because plaintiff has never been allowed to make any showing and the majority is not now remanding to allow him to do so. I would only add that a rule requiring exploration of the best interest of Christina in light of the new reality that plaintiff is not her father would be far more desirable than the Court's holding, which makes that irterest irrelevant.

Finally, I do not agree that there are compelling policy reasons to impose the result the majority has reached. First, the majority has greatly overstated the effect of the presumption of paternity. There are states in which the presumption of paternity would support the decision the majority has reached. See *Michael H. v. Gerald D.*, 491 U.S. 110 (1989) (upholding California's irrebuttable presumption statute); *In re J.W.T.*, 872 S.W.2d 189 (Tex. 1994) (striking down similar Texas statute). Vermont is not one of them. 15 V.S.A. § 308(4) creates a *rebuttable* presumption of paternity. In this state, rebuttable presumptions operate only to assign the burden of production. See V.R.E. 301(a). Once the party against whom the presumption operates bursts the bubble by presenting evidence that the fact is not as presumed, the function of the presumption is over and the fact-finder must determine the fact, here paternity, based on the evidence and not the presumption. See *id.* 301(c)(3); Reporter's Notes, V.R.E. 301. The presumption is rebutted by *any* evidence that the fact is not as presumed.

My point is that the Vermont presumption of paternity never operates to determine paternity contrary to the evidence, see *id.*, exactly the effect the majority seeks to assign it here. By adopting a rebuttable presumption, the Legislature has refused to make a man a father based on a legal fiction, rather than on his action. In this case, plaintiff rebutted the presumption of paternity, and it should not stand in his way to a just result.

We are left then with the majority's assertion that our policy must preserve the stability of family units and require plaintiff to continue his relationship with Christina whether or not he is her biological father. The policy of requiring the husband of the mother of a child to accept paternity, despite biological evidence to the contrary, is based on two rationales: (1) because of the stigma and legal disability of illegitimacy, the law should avoid placing children in this status; and (2) the law should promote intact families. See *Michael H. v. Gerald D.*, 491 U.S. at 125. The policies and rationales were developed in early English law dating back to the 16th century. See *id.* at 124-25.

The rationales are greatly weakened by modern conditions. Approximately 25% of children in this state are born of parents who are not married to each other. See Vermont Dep't of Health, Agency of Human Servs., *State of Vermont 1995 Vital Statistics* (1997) at 31. The legal disadvantages of illegitimacy have largely been eliminated as a matter of federal constitutional law. See *Smith v. Cole*, 553 So. 2d 847, 850 n.4 (La. 1989) (citing Supreme Court cases invoking Equal Protection rights of illegitimate children). The rights of putative fathers have expanded. See *id.* at 851 (citing Supreme Court cases delineating Due Process rights of biological fathers). Societal attitudes about the obligation of biological parents to support their offspring have changed. As the Indiana Supreme Court has observed:

> [S]tability and finality are significant objectives to be served when deciding the status of children of divorce. On the other hand, there is a substantial public policy in correctly identifying parents and their offspring. Proper identification of parents and child should prove to be in the best interests of the child for medical or psychological reasons. It also plays a role in the just determination of child support; we have already declared that public policy disfavors a support order against a man who is not the child's father. Conversely, . . . there is a substantial public policy which favors a support order against a man who is a child's father.

*In re S.R.I.*, 602 N.E.2d 1014, 1016 (Ind. 1992) (citation and internal quotation marks omitted). In discussing those Pennsylvania cases which are consistent with the majority decision here:

> Substituting a legal fiction for a biological reality results in a host of inequities for the child, the presumptive father (i.e. the husband), and the alleged father. The child has a legitimate interest in knowing the identity of his biological father. The child's interests include knowing his lineal descent — for medical purposes, for inheritance and for other financial reasons.
>
> With regard to the presumptive father and the alleged father, both have a legitimate interest in knowing the identity of the natural father. One should not be forced to provide financial support for another man's child. Furthermore, this legal fiction of paternity may result in the denial of the right to visitation and/or custody for either the presumptive or the alleged father. As the United States Supreme Court stated [in *Michael H.*], in today's society "there is no room for dual parentage."

Comment, *Challenging the Paternity of Children Born During Wedlock*, 100 Dick. L. Rev. 963, 964-65 (1996). The first rationale no longer supports the policies the majority espouses.

The second rationale has even less support. It was formulated when families were required to stay together, and divorce was unavailable. Through no-fault divorce laws, we have accepted the break-up of family units that no longer seek to stay together. This family unit broke apart long ago, and no one suggests that it can be reunited. Requiring plaintiff to make child support payments from a divorce decree cannot be justified based on the desirability of keeping family units intact.

The majority opinion is premised on the belief that it is in the public interest to force the continuation somehow of a parent-child bond between plaintiff and Christina. We can force the continued payment of child support, but we cannot by this decision perpetuate a father-daughter relationship against plaintiff's will. The disclosure that plaintiff is not Christina's biological father has fundamentally altered this family whether we like it or not. The constitution gives us many powers, but we cannot order that plaintiff love Christina as his daughter or provide her the parental guidance we would expect of a father. Nor can we order Christina to treat plaintiff as her father.

Even if I thought that the policy reasons assigned by the majority were strong, I would question whether they outweigh the countervailing policy considerations. Although this Court is barring the door to prevent husbands from reopening divorce decrees to contest paternity determinations, the Legislature has provided that a wide range of persons can bring a parentage action against the natural parent to pursue support. See 15 V.S.A. § 302(a). Those include the child or the child's natural representative, the natural parent (i.e. the mother), the Office of Child Support under an assignment from a welfare recipient, and the Office of Child Support when requested by a parent. *Id.* I do not believe this decision is consistent with the Legislative policy. While other parties can, if they desire, require the court to shift the burden of paying child support onto the biological parent, where it belongs, the person bearing that burden improperly has no remedy to initiate that shift.

In recent years, we have placed far more emphasis on requiring responsible parents to pay for the support of their children consistent with their financial ability. This decision goes in the opposite direction. The biological father of Christina has escaped any responsibility for his action, while plaintiff is required to support a child who is not his. The result is neither just, nor consistent with our child support policy.

Finally, in our decision today we are rewarding fraud. The majority calls plaintiff's actions self-serving while ignoring that defendant misled her husband and her daughter for fifteen years and then precipitated this case by finally disclosing the truth, and doing so in a manner that caused plaintiff to hear this revelation from a child he had thought was his daughter. The majority questions why plaintiff did not act earlier, while ignoring that defendant intentionally kept from him the facts upon which the majority requires that he act. We are condoning affirmative misrepresentations to the court, not of collateral matters, but of the central facts upon which the divorce court must act to protect the children before it.

Because this decision is inconsistent with our own precedents as well as thoughtful decisions from other courts, is based on policies that are archaic and counterproductive to the concerns and interests we should respect, and is unjust to plaintiff, I respectfully dissent from the decision to affirm the dismissal of plaintiff's complaint. I would reverse and remand for a hearing and decision on the merits of plaintiff's action to reopen the divorce judgment based on defendant's fraud on the superior court.