John P. v Vito C. (2004 NY Slip Op 51758(U))

[*1]

John P. v Vito C.

2004 NY Slip Op 51758(U)

Decided on December 13, 2004

Family Court, Suffolk County

Freundlich, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 13, 2004

Family Court, Suffolk County
JOHN P., Petitioner,
against
VITO C., Respondent.
V-XXXX

David Freundlich, J.
Background
Crystal C. and Vito C. were married on September 21, 2002. Approximately two months later, the child A C. was born on November 25, 2002. Shortly thereafter, Crystal became seriously ill and after numerous medical procedures and treatments, died on June 8, 2004 at the age of 23. Vito C. was named as A's father on her birth certificate, and was, in fact, married to Crystal both when A was born and when Crystal died. A has lived with Vito C. continuously since her birth two years ago.
In September 2004, petitioner, John P., filed an order to show cause requesting that this court direct that DNA testing be done, name him as the biological father of the child, A C.; and grant him custody of that child; and such further relief as this court deems just. In support of his moving papers, petitioner submitted the results of a private DNA test which was performed on petitioner and A that named petitioner as the biological father. Respondent opposed petitioners motion, and objected to the child being tested without his consent. Respondent further asserted the defense of equitable estoppel arising out of Mr. P's failure to come forward sooner and the child's strong bond with her presumed legal father.
On October 8, 2004 both parties were before the court and this court ordered a genetic marker test. The matter was next heard on November 22, 2004. At that time, the results of the court ordered test revealed that petitioner was the biological father. [*2]Over respondent's objection, an order of filiation was entered naming petitioner as A's biological father. Thereafter on December 3, 2004, respondent moved this court for leave to renew and reargue his prior motion to dismiss the paternity petition, contending that this court was required to conduct a hearing on respondent's claim of equitable estoppel.
This court vacated the November 22, 2004 order and stayed the order of filiation. This court found that a sufficient factual showing was made to warrant a hearing on whether petitioner should be estopped from asserting his paternity of A C. This court also found that since there would be a substantial overlap between the factual issues of equitable estoppel and the factual issues in the custody trial (which by law must focus on the best interests of the child, and that the proof, in large degree, would be inseparable) the court would consider the doctrine of equitable estoppel as part of the overall custody case. Accordingly, the trial took place on December 3 and 6, 2004.
FINDINGS OF FACT
At trial, this court heard the testimony of Crystal's mother, Elena S.; Crystal's aunt, Nina M.; petitioner John P; respondent Vito C.; and respondent's mother, Lynn C. While the salient facts are undisputed, after careful consideration of the testimony and evidence adduced at trial, this court makes the following findings of fact.
Petitioner John P. and Crystal dated on and off for approximately one year. Although petitioner did not recall exactly when their relationship ended, it is clear that it was over by the Spring of 2002. He and Crystal engaged in sexual intercourse more than ten times, and toward the end of their relationship, they did not use any protection when having sex. After their relationship ended, Crystal contacted him and told him she was about two months pregnant and he might be the father. Petitioner told her he wanted to take a paternity test and she became mad and very upset that he asked. She then disappeared from petitioner's life until she saw him again when she was about seven months, and very visibly, pregnant. He again said, "if it's mine I'll take care of it" but that he wanted to know before he became attached to it. She became aggravated that he asked her and she again disappeared. When the baby was approximately two months old she came to petitioner's house with the baby. Upon seeing the baby, petitioner told his father, who was present at the time, that this might be his father's granddaughter. When asked to submit to a test, Crystal agreed but then never showed up. Approximately one month later, he learned that Crystal was already married to respondent so he assumed that he was not the father since she was married when she had the baby.
It was on or about April 21, 2002, that Vito C. first met Crystal when he ate at the Corinthian diner where she worked. He returned to the same diner to see her for the rest of the week, and on the second day they met, she disclosed that she was pregnant. Despite that fact, Vito and she dated, and throughout their courtship she continued her pregnancy. The two moved in together in June 2002. Vito accompanied her to her pre-[*3]natal doctor visits and was with her when sonograms were performed. Vito expected that the child would grow up as his, and to him it did not matter that the child was not biologically his. When he first saw the baby on the sonogram, he felt that "it was an awesome feeling." When Crystal told her mother she was contemplating marrying respondent, her mother encouraged them to marry before the baby's birth. Crystal's mother was confused when Crystal confided that respondent was not the biological father, but he wanted to marry Crystal nonetheless. The two were married on September 21, 2002, and A was born at University Hospital at Stony Brook on November 25, 2002. Vito was present at A's birth, assisted Crystal during her labor, and when his daughter was born it was the "best feeling in the world." After leaving the hospital the three returned to their home in Rocky Point and began their life as a family. A was Christened in the Catholic church, and during the past two years of A's life he has cared for and loved A. A calls him "Daddy, and waits with excitement at the front door when he returns home from work.
Sadly, Crystal became ill and thus began a series of medical procedures and treatments including laproscopies and a hysterectomy in April 2003. After A's birth Vito accompanied Crystal to no less than five hospitals and to countless doctor visits. On June 1, 2004 he let his COBRA health insurance lapse because he did not have the money to reinstate it. On June 3, 2004 Crystal was admitted to University Hospital at Stony Brook, as she had been vomiting blood. Crystal's illness was such that the doctors felt she needed to be moved to Mt. Sinai Hospital in New York City due to acute liver failure. However, upon learning that she did not have current insurance, the transport was halted. Crystal's aunt Nina worked tirelessly through the night and following morning to get Vito's insurance coverage reinstated and Crystal was transported to Mt. Sinai at 7:00 am the next morning. Crystal's health continued to decline, and by the following Tuesday she was brain dead and taken off life support.
Aside from Crystal's illness, the marriage suffered financial hardship when Vito lost his current job due to excessive absences, which he attributed to the time he had to take off due to her illness (he was subsequently re-hired after her death when the company was made aware of the circumstances). Before Crystal died, her mother encouraged her to return to New York to see doctors in New York. The two needed rent money for an apartment on Long Island, and borrowed $3,000.00 from Crystal's aunt as a deposit for first, last and current month's rent. After her death, the landlord returned the money and Nina M. received it back.
At some point prior to her death, Crystal told her mother that petitioner was really A's father. Elena S. contacted petitioner in July 2004 and told him Crystal had died and that she believed A was his child. Petitioner wanted to be sure A was his before taking any court action. Ms. S. arranged for genetic testing to be performed at her home. Upon learning that the results indicated he was the father, petitioner was allegedly overjoyed. Ms. M. retained the lawyer, and petitioner filed the instant petition.
Currently, both petitioner and respondent reside with their respective parents. [*4]Petitioner is 27 years old and lives in his parent's home two blocks from Ms. S' home, in Suffolk County, New York. He is working an apprenticeship for one year so that he will obtain a full-time union position in the tin-knocker's union. Prior to that, he worked many years as a direct-care counselor for traumatic care patients and was a house manager.
Respondent, 24, is living with A in his parents home in Westerly, Rhode Island. He returned there after Crystal's death on or about June 18, 2004. His mother, teaches pre-Kindergarten at Littlebrook preschool, and is also on the schools' board of directors. This is also the preschool that A attends. Ms. C. takes A to school Monday through Friday at approximately 6:45 am, and on Mondays, Wednesdays and Fridays A's grandfather, Vito C. Sr., picks her up at 2:30 pm. On Tuesdays and Thursdays Ms. C. brings A home with her at 12:30 pm and watches her until respondent returns home from work. Respondent pays for A's preschool at a cost of approximately $600 a month. Upon respondent's return home after work, he proceeds to feed, bathe, read to A and care for her. She waits excitedly at her front door when he returns home from work. Since he returned to his current job at Phoenix Optics as a technician, he has held this position for a year's time. After high school, respondent attempted to follow in his father's footsteps and joined the military. He received a general discharge-under honorable conditions. Thereafter he held two other jobs for a year each until his current position.
Upon respondent's return to Rhode Island, A had frequent week-end visits with her maternal grandmother, Ms. S., with the last visit taking place August 14, 2004. All conversation with Ms. S. stopped when respondent received the paternity and custody petitions, as respondent believed that Ms. S. might not return A to him, and he was concerned as to what Ms. S. might say to A on the phone.
Equitable Estoppel
Despite the fact that this court ordered a DNA test prior to addressing the estoppel issue, the fact that the testing was conducted does not bar this court from now deciding the estoppel issue, as the child's best interests are paramount. See, Matter of Richard W. v. Roberto Y., 240 AD2d 812 (3d Dept. 1997); Mancinelli v. Mancinelli, 203 AD2d 634, (3d Dept. 1994).
The doctrine of equitable estoppel is applicable in matters of paternity, child custody, visitation and support where it is invoked to further the best interests of the child (see Matter of Charles v. Charles, 296 AD2d 547 (2d Dept. 2002); Matter of Ettore I. v. Angela D. 127 AD2d 6, (2d Dept. 1987). "[T]he doctrine of equitable estoppel may successfully be invoked, in the interest of fairness, to prevent the enforcement of rights which would ultimately work fraud or injustice upon the person against whom enforcement is sought...[a]n estoppel defense may also be invoked where the failure to promptly assert a right has given rise to circumstances rendering it inequitable to permit the exercise of the right after a lapse of time" Matter of Ettore I. V. Angela D., supra at [*5]12; see Matter of Janis C. V. Christine T., 294 AD2d 496). Based on the totality of evidence adduced at trial, this court finds that the facts are sufficient to establish the elements necessary to support respondents' estoppel defense. Respondent has met the burden of proving each element of estoppel by clear, convincing and entirely satisfactory evidence. 
It is clear to this court that respondent loves A very much, and until the point when this petition was filed, there was never any question in his mind that he was not A's father, irrespective the biology. From the time he met and began a relationship with A's mother, he knew that he was not the biological father. Yet, with this knowledge, he still took on all of the responsibilities that any expectant father would undertake- he accompanied the mother to her pre-natal visits, was present with her to feel excitement at their first sighting of the baby in-utero as its image appeared on the screen, married Crystal before she gave birth and was present and assisted Crystal at A's birth. Despite their financial difficulties as a young couple with a new baby, respondent never quit the relationship or relinquish his role as A's father.
This court rejects the law guardian's argument that respondent is a poor father because he drove with a suspended license (subsequently cleared) and had financial difficulties during the marriage. Respondent, who was merely 22 when he met Crystal, took on all of the responsibilities that petitioner refused. Petitioner chose not to assume those responsibilities. He was informed not once, not twice, but three times that A shared his biology. There was never any concern exhibited over Crystal's health, nor did he ever indicate whether he shared any love for her. His only concern when he was informed of the pregnancy was whether he was biologically the father, and in fact stated that he had no assurance she was his child at all and that he would not have filed this petition if he did not know whether she was his. Moreover, petitioner's only reason why it would be best for him to be named as A's father is for her to know who her real family is. This court cannot help but wonder whether petitioner would ever have come forward had Ms. S. not approached him.
Further, as was the case in Matter of Richard W. V. Roberta Y., supra, petitioner remained silent and acquiesced to respondent's role as father. Petitioner's silence in the face of respondent's open and obvious assumption of the role of father, led respondent "to reasonably believe in his parental status, and to act in reliance on that conviction. To permit petitioner to take over the parental role at this juncture would be unjust and inequitable (see, Matter of James BB. v. Debra AA., 202 AD2d 852, 853)." Matter of Richard W. v. Roberta Y., supra at 814.
Likewise, respondent's "assumption of the actual physical and psychological burdens attendant to parenting a newborn and the extent of the parent-child relationship that he forged with the baby after she was born it is necessary to take into account the time, energy and money he expended to prepare for her arrival, his participation in decision making with regard to her upbringing and, not insignificantly, the fact that he married respondent..." Matter of Richard W. v. Roberta Y., supra at 814.
[*6]
Here, respondent married Crystal prior to A's birth, considered himself the father irrespective the biology, and did "all of these things in the belief that he was the child's father, and despite ample opportunity to disabuse him of this notion, petitioner took no steps to do so. Bearing in mind that the best interests of the child should be a guiding concern in cases of this type (see, Matter of Ettore I. v. Angela D., supra at 14; Purificati v. Paricos, 154 AD2d 360, 362), these facts, taken together, are sufficient to establish, prima facie, the elements necessary to support respondents' estoppel defense, shifting the burden to petitioner to show why it is not in the child's best interest to deny his petition on this ground (see, Matter of Sharon GG. V. Duane HH., 95 AD2d 466, 469, aff'd 63 NY2d 859)." Id., at 815. Petitioner has not done this.
A is now two years of age. She suffered a great loss when her mother died in June. She has lived with respondent and known him to be her father since the day she was born. Respondent considered her his child when she was growing in her mother's uterus. A is happy, is doing well and is surrounded by a loving family.
"[C]onsideration of the record as a whole leads to the conclusion that it is in the child's best interests to preserve her legitimacy (see, Matter of James BB. v. Debra AA., supra, at 853-754)." Matter of Richard W. v. Roberta Y., supra at 815. Respondent is the only father A has ever known. To take her away from that father and her paternal bond with respondent would do a great injustice and would not be in her best interests. Petitioner "has not demonstrated what benefit would accrue to the child as a result of granting his petition, aside from the desirability of knowing her true father, which is not, alone, enough to tip the scales in his favor (see, Matter of Sharon GG. v. Duane HH., supra, at 469)." Id. at 815.
Based on the foregoing, respondents' motion to dismiss the petition filed by John P. is granted. The petition under docketNo. P- is dismissed with prejudice. The order of filiation dated November 22, 2004 is vacated, and all proceedings relating to child support on behalf of A are terminated. The clerk shall forthwith take all steps necessary to recall any notification that may have been sent to the Bureau of Vital Statistics relative to the birth record of A.
Further, the custody application filed by Mr. P is denied. Lacking any rights as a father, Mr. P. has no nexus to A, and, therefore, no standing to seek custody of this child. In addition, the facts on the issue of estoppel militate against any award of custody to Mr. P. Clearly, A's best interests will be served by her remaining in the care of her legal father, Vito C.
This constitutes the decision and order of ths court.
Dated: December 13, 2004
 Central Islip, New York
[*7]
__________________________
J.F.C.