Matter of Ruth W. v Lewis F. (2006 NY Slip Op 51520(U))

[*1]

Matter of Ruth W. v Lewis F.

2006 NY Slip Op 51520(U) [12 Misc 3d 1191(A)]

Decided on April 21, 2006

Family Court, Kings County

O'Shea, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 21, 2006

Family Court, Kings County
In the Matter of Ruth W., Petitioner,
against
Lewis F., Respondent.
P-08381-01

Ann E. O'Shea, J.
This matter is presently before the court on remand from the Appellate Division, Second Department, to determine, after a hearing, if a formal, legal determination as to whether petitioner's father, the respondent herein, is also Quymell's father "will cause Quymell to suffer irreparable loss of status, destruction of his family image, or other harm to his physical or emotional well being" (Ruth W. v Lewis F., 11 AD3d 627, 628). Having heard the testimony of the witnesses and considered the report of the forensic evaluator and the arguments of counsel, and having held an in camera meeting with Quymell, the court issues its decision with regard to that issue.
Procedural History
On September 25, 2001, Ruth W. filed a paternity petition alleging that her father, respondent Lewis F., is also the father of her son Quymell.[FN1] Ruth W. sought DNA tests and the court's official declaration that Lewis F. is Quymell's father, as well as an order of child support. The parties appeared before the court in January 2002 and the court ordered the Administration for Children's Services ("ACS") to conduct an investigation of the allegations in the petition and of the children's living conditions. ACS submitted an initial report, dated April 4, 2002, which related Ruth W.'s assertions that her father had begun sexually abusing her when she was about nine years old and that the abuse continued into her adulthood, including during the period when Quymell was conceived and born.[FN2] ACS also reported that Lewis F. admitted to having a sexual [*2]relationship with his daughter but claimed that such relationship did not begin until Ruth W. was in her 20s and addicted to crack. According to Lewis F., he gave Ruth W. money for drugs in exchange for sex. Lewis F. did not deny the possibility that he was Quymell's father. The report additionally indicated that Quymell had some idea that his grandfather might also be his father.
On June 14, 2002, Family Court Judge Rachel Adams, the judge then presiding over this matter,[FN3] dismissed the petition based upon her conclusion that it would be against public policy to grant the petition thereby declaring to the parties, to Quymell, and to the world at large, by court order, that Quymell is the product of an incestuous relationship between his mother and his grandfather. In July 2002, Ruth W. filed a Notice of Appeal of the dismissal and simultaneously moved for reargument before Judge Adams.
On November 19, 2002, while the appeal was pending, Judge Adams granted the motion for reargument and reinstated the paternity petition with respect to Quymell. Judge Adams held that a hearing was required to determine whether a declaration of paternity would be in Quymell's best interest and ordered a forensic evaluation to aid in that determination. Ruth W. appealed the November 19, 2002, order. In the meantime, an initial, "interim" report dated July 17, 2003, and a "supplemental" report dated December 12, 2003, were submitted by the forensic evaluator, Dr. Mark Rand..
On January 6, 2004, while the matter was still pending in the Appellate Division, Judge Adams ordered that petitioner, respondent, and Quymell undergo genetic testing based upon a determination that none of the statutory exceptions in Family Court Act ("FCA") § 532 to the general rule that genetic marker or DNA tests may be requested or ordered was applicable. A report of the genetic testing was provided to the court and counsel for the parties on February 19, 2004. However, tests were reordered because of infirmities in the report. The report of the second genetic test results was provided to the court and counsel on May 7, 2004. Lewis F.'s counsel objected to the results on the ground that the testing laboratory was not made aware of the familial relationship between the parties. In the meantime, the Appellate Division, in an order issued on October 18, 2004, affirmed Judge Adams' November 19, 2002, decision and remanded the case to Family Court for a hearing to determine if a legal declaration of Quymell's paternity would be in his best interest (Ruth W. v Lewis F., 11 AD3d 627).
 The hearing commenced before this court on March 18, 2005, and concluded on June 15, 2005. The evidence presented at the hearing consisted of Dr. Rand's July 17, 2003, and December 11, 2003, written reports as well as testimony by Dr. Rand, Ruth W. and Lewis F..
Dr. Rand was qualified as an expert in forensic psychology. He acknowledged, however, that he had limited experience with paternity issues and no experience with issues of paternity in the context of allegations of incest. Nonetheless, Dr. Rand testified without opposition. He concluded that it "would not be in the best interest of Quymell for [Lewis F.] to undergo a paternity test," which the court interprets to mean that there should not be a formal judicial determination as to whether or not Lewis F. is Quymell's father, since the parties have now already undergone two court-ordered genetic tests. Dr. Rand based his conclusion on his belief that such a determination (a) would possibly shatter a fragile family structure; (b) would be [*3]likely to destabilize Quymell's relationship with and access to Lewis F; (c) would possibly lead to fissures in Lewis F.'s relationship with Pearl F., which would also negatively affect Quymell since he now lives with Lewis F. and Pearl F; (d) would likely upset Quymell's relationship with his half-brother Jamell; and (e) would "increase the risk that the youngster will be stigmatized by his peers."
With due consideration and respect for Dr. Rand's opinion, this court disagrees. Having considered all the evidence presented, the arguments of counsel, and Quymell's unambiguous, definitive and rational declaration of his own wishes, the court concludes, for the reasons stated, that a formal determination, through DNA testing, and declaration as to whether Lewis F. is Quymell's father will not cause Quymell "to suffer irreparable loss of status, the destruction of his family image, or other harm to his physical or emotional well being" (Ruth W. v Lewis F., 11 AD3d at 628) any more than he has suffered already and that, all things taken into account, such determination and declaration is in Quymell's best interest.
Dr. Rand described Quymell as a child who was "developmentally delayed" and who had "difficulty at times with articulation." Dr. Rand expressed the opinion that Quymell, in part because of these "vulnerabilities" and cognitive and educational deficits, needed stability in his life and in his family more than most children. In Dr. Rand's view, a determination that Lewis F. is Quymell's father would lead to a general destabilization in Quymell's life and family. However, Dr. Rand acknowledged that Quymell had never enjoyed a stable life: among other things, his mother had suffered from alcohol and unlawful drug use for years; Quymell was shuttled back and forth between his mother's home and his grandparents' home from the time he was born; ACS had numerous involvements in Quymell's family and on more than one occasion had removed Quymell and his siblings from Ruth W.'s care. All of this instability existed before the issue of Quymell's paternity ever arose. The stresses on Quymell's family plainly increased after the incestuous relationship between Ruth W. and Lewis F. came to light, at the very least because it led to constant arguing and fighting between Ruth W. and her paramour Lawrence W. However, the fights were not so much about whether Quymell is Lewis F.'s son, but about Lewis F.'s and Ruth W.'s incestuous relationship. That such a relationship was carried on for many years is now known by all of the players in this sad drama. Quymell has been told by his mother, by Lawrence W., and possibly by Lewis F. that Lewis F. is his father. There is no reason to believe that the fighting and arguments will be abated by leaving the question of Quymell's paternity unanswered or intensify those battles if Lewis F. is determined to be his father. Indeed, it is more likely that those conflicts will be quieted by a final determination, as the matter finally will be put to rest.
Dr. Rand's view that a determination that Lewis F. is Quymell's father would negatively impact their relationship is not borne out by the evidence. To the contrary, Quymell repeatedly told Dr. Rand that he would be happy to learn that Lewis F. is his father. Quymell never expressed anything to suggest that, from his perspective, such knowledge would lead to any rift in or damage to his relationship with Lewis F.. Ironically, Quymell has found the greatest stability in his grandparents' home and in his relationship with his grandfather. Quymell viewed identification of Lewis F. as his father only as positive, as a way to deepen his relationship with Lewis F. and to finally resolve the mystery that has clouded the relationships among all the parties since this case began a resolution "devoutly to be wished" by all the parties.
On Lewis F.'s part, while he expressed concern that the disclosure might damage his relationship with Pearl F. for obvious reasons and his relationship with Jamell because [*4]Jamell might feel slighted and worry that Quymell would receive preferential treatment  he expressed no concern that his relationship with Quymell would suffer. Indeed, he insisted that it would not and that he would continue to treat Quymell and Jamell the same even if it is determined that he is Quymell's father. To reach the conclusion that a determination of Quymell's paternity would be destructive to Quymell's relationship with Lewis F., one would have to discount everything that Quymell and Lewis F. reportedly told Dr. Rand and what Lewis F. testified to at trial as inherently and completely incredible and unreliable. To do so is not only wholly unwarranted, it is grossly unfair to Lewis F. and Quymell.
Similarly unfounded is Dr. Rand's view that the relationship between Lewis F. and Pearl F. will be seriously fractured by a determination that Lewis F. fathered Quymell. Such a determination is in someways an afterthought. Whatever damage may have been inflicted to the 50-year-long relationship between Lewis F. and Pearl F. arises primarily, if not wholly, from the disclosure of the fact that Lewis F. engaged in an incestuous relationship with their daughter. As noted, that fact has been announced by Ruth W. and confirmed by Lewis F. Identifying Lewis F. as Quymell's father is not likely to hurt Pearl F. anymore than the knowledge of the forbidden relationship between Lewis F. and her daughter. Pearl's reported statements to Dr. Rand confirm that whatever upset or distress she has suffered from the disturbing revelation, her relationship with Lewis F. would survive, as it has since the incest was disclosed, during more than four years of this stressful and intrusive litigation, and as it has survived for nearly 50 years before. Moreover, there is nothing to suggest that Pearl F.'s relationship with Quymell would change. What Pearl F. wants is that the controversy be put to rest and that she and her family be left alone. To base a conclusion that it would not be in Quymell's best interest to have Quymell's paternity formally established because of an assumed injury to Pearl F.'s relationship with Lewis F. would require that all her reported statements to Dr. Rand be disregarded. There is nothing before this court to suggest that Pearl F. was incapable of or unwilling to express her true feelings about the matter or that what she reported to Dr. Rand is not worthy of credence
There is no evidence whatsoever to support Dr. Rand's conjecture that a determination that Lewis F. is Quymell's father would damage Quymell's relationship with Jamell.
Dr. Rand's concern that Quymell may be subjected to teasing by his peers if it is determined that his grandfather is his father is reasonable conjecture, but conjecture nonetheless. Dr. Rand presented no evidence that Quymell had been subjected to such teasing in the years that this litigation has been pending while the question of his paternity remained in doubt in any informal sense to anyone other than Quymell. Nor did Dr. Rand, who admittedly has no expertise in matters of this nature, offer any evidence of the likelihood that such teasing would occur. [FN4]
In opposition to what appear to be Dr. Rand's assumptions about how the parties should feel is what Quymell thinks and wants. As noted, Quymell repeatedly told Dr. Rand that it would make him "happy" to learn that Lewis F. is his father and he would be "sad" if that turned out to not be so. The Law Guardian reported that Quymell clearly expressed to her a desire to know if Lewis F. is his father. My meeting with Quymell confirmed the Law Guardian's report. [*5]Quymell's developmental delays and difficulties with articulation, which Dr. Rand described, are apparent. Quymell probably does not fully understand the societal and cultural taboos associated with incest, although he does sense that there is something significant and unorthodox and, perhaps, unsavory about his parentage a "secret" that his family is keeping from him. Nonetheless, whatever deficits Quymell might have and however imperfect may be his understanding of the societal implications of a determination that his grandfather is also his father do not diminish his unequivocal and clearly articulated wish to know who his father is. In paternity proceedings, as in custody cases, a teenager's wishes, while not dispositive, are entitled to significant weight (see, e.g., Carol S. v Gerard D., 276 AD2d 377, 378 [1st Dept 1997]). Here, it is not just to satisfy his curiosity that Quymell wants to know. Quymell wants to have a father whom he can talk to, as son to father, and from whom he can seek and obtain fatherly guidance and advice. It is his belief that knowing who his father is will keep him from getting into trouble on the streets. Quymell appears to feel that his relationship with Lewis F. will be deeper, more intimate, more important if Lewis F. is his father. Whether that proves true or not remains to be seen, but his wishes should be and are accorded substantial weight. "The chief purpose of the paternity proceedings is to secure the health, welfare and happiness of the child" (Ettore I v Angela D., 127 AD2d 6, 18 [2d Dept. 1987]). Family Court Act §532 (a) mandates DNA testing when a genuine paternity controversy exists, unless there is a specific finding that to do so would not be in the child's best interest because the matter has already been adjudicated, because the person seeking the testing should be equitably estopped to preserve the child's image of his family (see Ettore, 127 AD2d at 22 ), or to protect the presumption of legitimacy. Not one of the statutory exceptions apply in this case.
 No one else has been adjudicated to be Quymell's father, nor is it likely that there is anyone else who might be. The presumption of legitimacy does not apply to Quymell as Ruth W. has never been married. Nor has anyone other than Lewis F. acted as a father to Quymell, Unlike the child in Ettore, Quymell was not raised in an intact family with either an identified biological father or a stepfather whom Quymell regarded as a paternal figure. Although Ruth W. once told Quymell that a man she identified only as "Calvin" was his father, "Calvin" remains a disembodied name, a phantom figure whom Quymell has never met let alone with whom he has had any relationship. Since then, Ruth, Lawrence, and perhaps even Lewis F. have repeatedly told Quymell that Lewis F. is his father. No one, other than Lewis F., has acted like a father to Quymell. But for the allegations of incest, the principles of estoppel could be applied to preclude Lewis F. from denying that he is Quymell's father. There is no alternate image of Quymell's family to protect. The Second Department, in Jean C. v Andrew B., 86 AD2d 891 [1982], held that neither the best interest of a child nor any "public policy" to free a child from an undesirable father may serve as a basis for refusing to enter an order of filiation when paternity has been established by clear and convincing evidence. Similarly, there is no identifiable basis or principled reason, in this case, to deny the application to obtain such evidence because it may turn out that Lewis F. is Quymell's father.
The revelation of the incest between Ruth W. and Lewis F. was the event that posed the greatest potential for severing the fragile threads that bind this family together, yet the relationships, fractured though they may be, have continued through more than four years of litigation and outside probing. At this point, the greatest potential for damaging Quymell's emotional and psychological well being lies in the failure to answer the question. While the truth may not always set you free, in this case, the truth of Quymell's paternity will free Quymell from [*6]frustration of not knowing who his father is and his yearning to have a father. Quymell has made it clear that he would be happy to have Lewis F. as his father.
For all the foregoing reasons, the court concludes that determining to a scientific certainty if Lewis F. is Quymell's father and, if so, a legal declaration of his paternity will not cause Quymell to suffer irreparable loss of status, destruction of his family image, or other harm to his physical or emotional well being.
This constitutes the decision of the court.
Dated: April 21, 2006__________________
Ann E. O'Shea, FCJ

Footnotes

Footnote 1:Ms. W.' petition included the same allegations with regard to her older daughter Shalena, but the petition was later dismissed to the extent it sought an order of filiation with respect to Shalena on the ground that Shalena was over 21 when the petition was filed (Order, November 19, 2002, Adams, Rachel J). The dismissal was upheld on a subsequent appeal (Ruth W. v Lewis F., 11 AD3d 627, 783 NYS2d 73 [2d Dept 2004]). 

Footnote 2:While Ruth W. reportedly told Dr. Rand that she gave birth to Quymell when she was in her 20s, the ACS reports report her birth date as June 9, 1958, which would make her about 31 when Quymell was born on September 12, 1989.

Footnote 3:Unfortunately for the parties and for Quymell, this case has been before three separate judges in the four years it has been pending in this court.

Footnote 4:In any event, while the testimony and views of a forensic evaluator should be considered, they are neither dispositive nor binding on a court (see Young v Young, 212 AD2d 114,118 [2d Dept 1995]. The ultimate decision rests with the court (see Lisa W. v Seine W., 9 Misc 3d 1125A [Fam Ct, Kings Cty 2005])