Matter of J. v B. (2007 NY Slip Op 50950(U))

[*1]

Matter of J. v B.

2007 NY Slip Op 50950(U) [15 Misc 3d 1132(A)]

Decided on May 1, 2007

Family Court, Onondaga County

Hanuszczak, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected in part through May 17, 2007; it will not be published in the printed Official Reports.

Decided on May 2, 2007

Family Court, Onondaga County
In the Matter of J., Petitioner
against
B., Respondent.
P-04481-06

Melvin & Melvin PLLC, Frank J. Vavonese, Esq. and Scott A. Brenneck, Esq., of counsel, attorneys for the petitioner; Karen J. Docter, Esq., attorney for the respondent; Christina G. Cagnina, Esq., Law Guardian

Michael L. Hanuszczak, J.
On June 16, 2006, the petitioner filed a paternity petition in which he sought an order of filiation declaring him to be the father of the subject child M., whose date of birth is June 8, 2004.
In his sworn and verified petition, the petitioner stated that at the time of the child's conception, the mother was married to R.
The initial appearance on the proceeding was held on July 13, 2006 before the Hon. William J. Burke, acting as a Judicial Hearing Officer, who transferred the matter to a Family Court judge since the child was conceived and born during the mother's marriage to R. The matter was assigned to Part I of the Family Court, and on August 14, 2006 the Court assigned a law guardian to represent the child.
On August 11, 2006, the attorney for B. filed a motion seeking to have J.'s petition dismissed. B.'s Affidavit stated that she and R. cohabit as husband and wife, that the child was born during the marriage, that she considers her husband to be the child' father, and that the child and her husband are in an operative parent-child relationship. As a basis for the dismissal of the petition, her attorney cited the legal doctrine of equitable estoppel in the case of a child who is in an operative parent-child relationship in an existing marriage.
On September 12, 2006, the attorney for J. filed papers in opposition to the motion to dismiss.In his Answering Affidavit, J. stated he had sexual relations with B. and that the child was his son. J. provided many details of his alleged relationship with B. and with the child. His attorney argued that equitable estoppel does not apply in this proceeding because J. has an existing relationship with the child and that he and his client are prepared to rebut the presumption of legitimacy for a marital child.
The motion was returned to the Court on September 18, 2006 with B.'s attorney arguing for an equitable estoppel hearing and for dismissal of the paternity petition. J.'s attorney opposed the dismissal of the paternity petition and sought a genetic marker (DNA) test. The Law Guardian supported the motion to dismiss and also asked for a hearing on whether J. should be equitably estopped from pursuing his paternity claim prior to the Court's making any determination on whether to order a DNA test.
The Court scheduled a hearing for the purpose of determining whether equitable estoppel applies and denied B.'s motion to dismiss the paternity petition with leave to renew the motion to dismiss upon the completion of the estoppel hearing.
On September 25, 2006, the Court returned five subpoenae duces tecum, unsigned, to J.'s attorney as they did not comply with requirements of Rule 3122 of the C.P.L.R.
On October 17, 2006, the attorney for B. filed a motion for a protective order in connection with discovery but later withdrew the motion on October 23, 2006.
On October 27, 2006, the attorney for J. filed an Order to Show Cause and Affidavit requesting medical records for B. and the child. On November 3, 2006, the attorney for B. filed an Affidavit opposing the records request. On November 13, 2006, after extended discussion by the attorneys regarding videotapes and other pictorial evidence, the Court directed the attorney for each of the parties to prepare a representative, ten-minute video presentation to be used to supplement photographs received into evidence. On November 14, 2006, the attorney for B. [*2]filed an Order to Show Cause for protective relief in connection with discovery. On November 16, 2006, the Court denied the request for B.'s and the child's medical records and directed that the child's birth certificate be available to be entered into evidence.
The equitable estoppel hearing was conducted on the following days: November 13, 2006, November 16, 2006, November 17, 2006, January 25, 2007, January 26, 2007, January 29, 2007, January 30, 2007, and April 4, 2007. The Court notes that a variety of factors contributed to the overall length of the estoppel hearing, including the schedules of the attorneys and the Court, motion practice concerning a number of discovery issues, and the extensive nature and presentation of J.'s case.
STANDARD OF LAW
The doctrine of equitable estoppel in a paternity action is codified in Section 532 (a) of the Family Court Act, which states that no DNA test shall be ordered upon a written finding by the court that it is not in the best interests of the child based on equitable estoppel. The use of equitable estoppel in a paternity action has been further defined by well-established case law.
The Court of Appeals has ruled that the court should determine whether estoppel applies prior to ordering a DNA test. (Shondel J. v. Mark D., 7 NY3d 320.) The Court of Appeals has also held that it is the child in whose favor estoppel is applied and the analysis rests exclusively on the best interests of the child rather than on the equities between the two adult parties. (Id.)
The following factors must be considered by the court in its best interests analysis: the nature and extent of the existing parent-child relationship; the child's interest in knowing the biological identity of the father with certainty; the traumatic effect that DNA testing may have on the child; the impact that uncertainty might have on the father-child relationship; and if paternity is being denied, whether the identity of others who may be proven to be the father is known or likely to be determined. (Hammack v. Hammack, 291 AD2d 718; Gutierrez v. [*3]Gutierrez-Delgado, 33 AD3d 1133.)
Decisional law holds that the doctrine of equitable estoppel may be properly applied by the court in a proceeding in which the paternity petition is filed by a putative father to establish paternity rather than to deny paternity. (Sharon GG v. Duane HH, 95 AD2d 466. ) When, as in this case, the respondent makes a showing of the operative facts which would support an equitable estoppel, the burden of proof then shifts to the petitioner to show why an estoppel should not be applied in the best interests of the child. (Ettore I. v. Angela D., 127 AD2d 6)
SUMMARY OF TESTIMONY
As background to the trial testimony, the Court notes that J.'s paternity petition alleges that he and B. had sexual relations over a period of time from February, 2003 until June, 2005. He testified that he was aware that B. was married to and living with her husband R. He also testified that R. knew about the alleged affair. B. testified that she and her husband have cohabited as husband and wife with no interruptions during their marriage and that they currently live together with their daughter and with the subject child of this proceeding and that the child and R. have a father-son relationship. R. corroborated his wife's testimony.
In describing the nature and the extent of his relationship with the child, J. testified that he attended B.'s pre-natal medical visits and birthing classes and was present in the operating room in the hospital for the child's birth by Caesarian section. He testified that he slept in B.'s room at the hospital after the birth for a period of five days and accompanied the mother, child, and R. to the marital residence. He also testified that he lived with B. at the marital residence for a period prior to the birth and thereafter for a period of approximately four months while, at that same time, R. occupied another bedroom in the residence. He testified that he attended to the child's needs at night while he lived at her residence. J. testified that during the period of time when he resided at the martial residence, he read books to the child, took the child for stroller [*4] rides around the block, played with the child and the child's toys, and took the child to the mall, to his parents' home, and to his own apartment. He testified that he accompanied B. and the child on a vacation to Florida in the fall of 2004 to visit B.'s mother and that B. introduced him as the child's father. J. testified that he has attended at least four pediatric visits for the child with B. and that he took the child to one pediatric visit by himself.
J. further testified that he routinely spent time with the child after he moved out of the marital residence in the early months of 2005. He testified that during 2005 he went to the marital residence on Tuesday and Thursday at about 10:00 a.m. after he worked out at the gym and that he would then spend the day at the residence. He also testified that he was with the child on Friday and Saturday at night after work and on Sunday. He testified that during these visits he would play with the child and that he and B. would take the child to parks, the mall, the zoo, and swimming at the YMCA. He testified that B. permitted him to take the child, whereupon he took the child to his apartment and to visit J.'s parents, brother, and uncle. He testified that he accompanied B. and the child to Florida in the spring of 2005 to visit her mother. He also testified that he was given a Father's Day card in 2005, which was received into evidence. He stated that the card was signed by B. on the child's behalf. He further testified that he took the child to family events at his parents' and brother's homes, including Christmas Eve in 2004 and 2005 and birthdays in 2005. The Court received into evidence photographs and a video recording showing J. and the child at Christmas celebrations and events during 2004 and 2005.
J. testified that he and B. kept it a "secret" from R.'s relatives that he was the child's father. He stated that B. referred to him as the child's father in front of his relatives. J. admitted that he knew that R. was also called "dad" with respect to the child by B. and others. J. further claimed that he held himself out to be the father of the child in front of B. and his own family. He also testified that he did not want to embarrass R. so he did not claim to be the child's father[*5] at other times, including on the child's baptismal certificate on which he is listed as a witness and R. is listed as the child's father. He testified that he agreed to R. being designated the child's father on the baptismal certificate for the child's well-being as he did not want the child to be "dragged through the mud down the road" by R.'s family. He further testified that he and B. kept his position as the child's father a secret in front of R.'s family. He also testified that in 2005 he told a Child Protective Services investigator that he was a friend of the family rather than the child's father so as not to embarrass R.
J. testified that he agreed to allow B. to keep a separate photo album of him with the child as he did not want to embarrass R. or his family. He testified that B. kept the album at her residence in a closet and that he did not have copies of the pictures showing him and the child.
J. testified that he is "attached" to the child and that he wants to be a "good father." He stated that he wants the child to know that he is the father, wants to play with the child, and wants to see the child grow up. He further testified that he is prepared to accept financial responsibility for the child.
J. admitted that the child has never referred to him by any name, such as "da-da," that would indicate that he is the child's father.
In his testimony concerning that nature and extent of his relationship with the child, R. testified that he was very excited when he learned of B.'s pregnancy and that he and his wife prepared a room for the baby and purchased baby clothing, furniture, and other items. He testified that he attended prenatal visits and birthing classes at Community General Hospital with his wife. He testified that he hired an additional employee at his farm so that he would have more time to spend with his wife and new child. He testified that he attended pre-natal visits with his wife and that he was in the delivery room at the hospital for the birth of the child. R. acknowledged that he was not present in the operating room for the actual birth of the child but[*6] that J. was present. He testified that he saw the child about an hour after the birth and took photographs of the child in the nursery and later of his wife and child in the hospital. He identified a picture which he took of the child in his "isolette" in the "baby room" at the hospital shortly after birth and which was received into evidence. He testified that he fed the child, diapered the child, and held the child after the child returned home from the hospital. R. denied that J. resided at the marital residence. He also stated that he brought B. and the child home from the hospital and that J. was not present. He testified that J. saw the child occasionally as a family friend.
R. testified that he has been involved with the child on a daily basis as a father since the time of the child's birth. He testified that he has cared for and played with the child on a daily basis since birth. He testified that the child began to recognize him at about six months of age and to call him "da-da" prior to his first birthday. He testified that after the child turned one year old, the child would run through the kitchen to greet him every day when he came home from the farm for lunch and after work and that the child would hug him. R. testified that the child now calls him "daddy" and reacts to him with smiles and hugs.
R. testified that from about the time the child was a few months old, the child would visit the family farm frequently to visit R.'s father, mother, and sister and to see the little calves. R. stated that sometimes he takes the child to the farm and that sometimes B. brings the child to the farm. He also testified that he and the child have been involved in a number of special activities since the child was about eighteen months old. He testified that he reads books to the child and that the child loves the book "Thomas the Train." He stated that the child also enjoys toy tractors and trains and that he and the child play with the trains which are set up in the basement of their home. R. testified that the child has been enrolled in pre-school at the B. Church for over a year and that he takes him to school and picks him up occasionally. He testified that he and his wife[*7] and the child swim a few times per week at the YMCA where they hold a family membership and that this activity has been going on for over a year and prior to the commencement of the paternity action. He also testified that on a few occasions he has gone to Gymnastics to view the child's activities.
R. testified that he and his wife discussed the matter of religion and decided to have the child baptized at a non-denominational Christian church. He testified that he is designated as the father on the baptismal certificate and that J. was in attendance at the ceremony as one of two witnesses and that other family and friends attended the ceremony. He identified the Church baptismal certificate dated October 24, 2004 which was received into evidence.
R. testified that the child has spent all of his Father's Days with him. He testified that he spent Christmas and other holidays such as Easter and Halloween with the child. R. testified that he has been present for the child's birthdays in 2005 and 2006 and that the child has been present for his birthday celebrations. He further testified that he and his wife have taken the child to Florida and on other family vacations. He acknowledged that the child and B. spent Christmas Eve in 2004 with J. and that the child was with J. on Christmas Eve in 2005.
R. testified that he has held himself out to be the child's father since the time of birth to family, friends, neighbors, and to the general public. He testified that he and the child have a "strong father-son bond," that he "loves" the child, and that it has been "an honor and a privilege to raise him." The Court received into evidence a compilation of photographs and a video presentation prepared for the proceeding which depict R.'s daily relationship with the child from the time of the child's birth to the present as well as his interaction with the child on holidays, vacations, and special celebrations.
R. testified that his wife is not employed outside the home and that he provides the sole financial support for the child, including shelter, food, clothing, and miscellaneous items[*8] such as vacations, membership in the YMCA, pre-school tuition, and gymnastics class tuition. He testified that he maintains a Blue Cross/Blue Shield health insurance policy and that the child was placed on the family policy at the time of his birth. He testified that he is the sole payer of unreimbursed health care expenditures for the child. He testified that his wife's pregnancy and delivery costs were covered by the family health insurance plan or were solely paid by him. He stated that he also paid for B.'s birthing classes. The Court received a variety of exhibits into evidence such as insurance and billing statements covering expenditures made by R. and checks signed by R. on behalf of the child and B., prior to and after the birth of the child.
R. testified that he provided the money for a college fund account which was opened for the child at F. Bank on July 20, 2004 and to which his mother has also contributed and which is held in B.'s name. The Court received into evidence written documentation regarding the college fund for the child. He also testified that he purchased a life insurance policy on himself with the child listed as the beneficiary.
J. testified that he does not have any physical evidence showing that he provided financial support for the child or for B.'s pregnancy, but he stated that he had given B. unspecified amounts of cash and periodically provided diapers and clothes for the child.
J. testified that he purchased an $859.00 jungle gym kit for the child shortly before the child's first birthday in 2005 which he assembled in the yard of the marital residence. He identified receipts which were received into evidence showing that he paid for the jungle gym at the H. D. store in cash and by his credit card. R. testified that he paid cash to J. to cover the cost of the jungle gym and that he also paid $200.00 in cash to J. to assemble the jungle gym.
J. testified that late in the year 2004 and again in the early part of 2005 he was told by B. that she wanted him to "move on" and not be around the marital residence as frequently as before. J. testified that B. informed him that she would always stay with her husband. He also [*9]testified that he and B. were not getting along too well at that time so he decreased the frequency of his visits at the marital residence. He further testified that in the fall of 2005 he had a conversation with R. and B. in person in which he was again advised to move on" with his life. J. also testified that R. told him that he "would always be married to B." He testified that at this point he was still seeing the child several times per week and that he was present at the marital residence on June 8, 2006 for the child's second birthday party, but "was not fully aware [it] was going to be a birthday party." J. stated that he arrived late at the party and gave the child a tricycle, which was a present provided by his parents.
J. testified that he filed the paternity petition after he and B. had an altercation at his apartment on June 10, 2006 in the presence of his girlfriend. He further testified that B. told him he would never see the child again and that, thereafter, he saw the child infrequently. However, he stated that on August 4, 2006 B. brought the child to him and told him to "take care" of the child.
B. testified that, beginning in January of 2005, she had several conversations with J. asking him to decrease the frequency of his visits to her home and to "move on" with his life. She testified that she and J. came to an "amiable friendship" in the summer of 2005 and that after that time he did not see her or the child with any degree of frequency. She denied the existence of a photo album containing pictures of the child and J. and also denied that J. had ever given her cash or funds for her child.
B. testified that there have been two mistakes made on the child's birth certificate. She stated that two or three weeks after the birth she received a birth certificate that listed the child' s last name as [J's surname]. She testified that, without her knowledge or permission, J. provided that misinformation to S., who was the birth registrar at the Hospital and an acquaintance of J.'s. B. testified that she spoke to J. about the situation and that he knew that she was going to change 
[*10]the certificate. She also testified that she contacted the registrar and the registrar's supervisor at the hospital to complain and that another birth certificate was issued to her shortly thereafter correctly listing the child's last name as [R.'s surname] but omitting any information as to the father. She testified that she contacted the hospital again and was informed that she would have to contact an "amendment center" in Albany to have the certificate corrected. She testified that she made contact with the center early in 2006 and that the corrected certificate was filed on October 11, 2006. In his trial testimony, J. stated that he was listed as the father on the original birth certificate and that he did not find out that there had been any modifications to the certificate until after filing his paternity petition when he attempted to gain a copy of thecertificate.
B. very credibly testified that her husband is a "superb" father and that he and the child have a close relationship. She stated that the child calls her husband "daddy" and that he has never used that or a similar term with respect to J.
J.N. testified that he is the father of the petitioner. He testified that he has seen the child between ten and twelve times since the child's birth, but also stated, "Not many for three years' time." He testified that B. referred to him as "papou" two or three times and that the term is a Greek word meaning "grandfather." L. testified that he is the brother of the petitioner. He stated that he has seen the child approximately once per month.
C. testified that she is B.'s mother and the child's grandmother. She stated that she resides in Florida. She testified that she traveled to Syracuse a few days after the birth of the child "on the 12th or 13th" and stayed at the marital residence. She testified that on that visit she observed R. come into the child's room to observe the child and to ask if he could be of assistance. She also testified that on that visit she observed R. lift the child out of the crib and feed the child. She stated that J. did not stay overnight at the marital residence during the time of [*11]her visit. C. credibly testified that she has witnessed many demonstrations of affection between the child and R. subsequent to that visit. She testified that she has heard the child call R. "dad" and has not heard the child call any other individual by that name.
C. testified that B., J., and the child visited her in Florida on two occasions. She denied that B. and J. shared a room at her residence.
P. testified that he has known R. for more than twenty years and that he is a farmer who lives about three and one-half miles from the marital residence. He testified that he saw the child at the marital residence about every two to three weeks during the child's first year and more frequently since that time. He testified that R. was "excited" about the child's birth and that he has observed R. caring for the child as a father over the past two and one-half years on numerous occasions at his farm, at the farm and marital residence, at social events such as parties and dinners, and at family recreational outings to Water Safari and while on a Carribean cruise in 2006 where he and his wife accompanied the B., R., and the child. He stated that on the recent cruise he observed "a lot" of interaction between the parents and the child and that they had "a lot of fun." He testified that the child calls R. "daddy" and is "inseparable" from R.P. testified that he saw J. once at the marital residence on the occasion of the child's first birthday party but could not recall any interaction between J. and the child at the party.
In his closing argument, the attorney for J. moved for a directed verdict in his favor. He argued that there was a strong relationship between his client and B. at one time and that there was a strong relationship between his client and the child from the time of birth which was subsequently destroyed by B..
In her closing argument, the attorney for B. opposed the motion for a directed verdict and renewed her previous motion to dismiss the paternity petition. She argued that the doctrine of equitable estoppel should be asserted on behalf of the child to preclude J. from asserting his [*12]paternity claim. She argued that the child considers R. to be his father; that the child was born during a marriage in which the parties are still together; and that R. has assumed full parental responsibility for the child.
In her closing argument, the Law Guardian supported the motion to dismiss the petition based on equitable estoppel. She argued that J. has permitted the child to develop a parentalbond with R.; that R. has been held out to be the father to the public; and that the child views R. as his father.
In his answering argument, the attorney for J. argued that his client did all he could to foster his relationship with the child and that B. should not be permitted to tell J. to "move on." He also argued that R. should be equitably estopped from asserting that the child is his son.
BEST INTERESTS ANALYSIS
Based upon the pleadings, testimony, and other evidence, the Court finds that J. had a relationship with the subject child of this petition but that the relationship falls far short of that of a parent to his child. The Court also finds that J. did not meet his burden of proof to show why it would be in the best interests of the child to order DNA testing.
By his own testimony, J. admitted that he kept silent about the child's paternity to others such as R.'s family, their acquaintances, the health insurance company, and even to the Department of Social Services, while holding himself out as the father to B. and his own family. J. testified that this was his decision and that he believed this arrangement was in the child's best interest. Indeed, he testified that he agreed to be listed as a witness on the child's baptismal certificate while R. was identified as the child's father. Once again, J.'s testimony is consistent with his stated belief that it would be better for the child to be publicly known as the child of R.
Significantly, nowhere in his testimony about this arrangement has J. made any explanation of how he expected the child to understand this complex situation or to keep the [*13]secret of his parentage. The Court cannot conceive that this type of arrangement is realistic or that it would be in the best interests of any child.
J. testified that he spent Tuesdays, Thursdays, Fridays, Saturdays, and Sundays with the child during most of 2005, but his testimony at trial is contradicted by his sworn Affidavit, dated
September 12, 2006, in which he stated that "during much of 2005 and 2006 Tuesdays, Thursdays, and Sundays were my designated times with [the child]..."
As the nature and the extent of the petitioner's relationship with the child is a key factor in the best interests analysis, the Court would expect detailed testimony on the interactions between the two, since J. testified that he spent a great deal of time in 2005 and the first half of 2006 caring for the child, i.e., Tuesdays and Thursdays from 10:00 a.m. through the day, Fridays and Saturdays after work, and during the day on Sunday.
Although the age of the subject child would have ranged from six months to two years during the time in question, it is noteworthy that J. provided no testimony concerning his involvement with any of the daily care issues which are a part of parenting a child of that age. He provided general testimony about his activities with the child and B. (stroller walks, swimming, shopping) and general testimony about the times when he was alone with the child (visits to his apartment and to family members), but made no mention of facilitating the child's nap time(s), and no mention of the other daily chores and activities which are a large part of parenting a child of this age.
Indeed, it is significant that J. did not even mention child-proofing his apartment so that the child would be safe there or purchasing any baby furniture such as a crib or high chair for his apartment so that the child could continue his normal activities when there. The Court does not find it realistic that J. could have spent at least three days per week with the child for over a year and not have addressed such issues and, therefore, finds this portion of his testimony lacking [*14]in credibility.
The testimony of J.'s father and brother also did not provide corroboration of his assertions that he had physical custody or control of the child for significant periods of time.
Significantly, neither his father nor his brother were present at the child's baptism or at any event taking place at the marital residence.
J. was not able to provide the Court with any pictorial evidence of the nature of his daily relationship with the child although there was evidence of his interactions with the child on Christmas Eve in 2004 and 2005, at the child's first birthday party in 2005, at a birthday party in J.'s family in 2005, at one visit to his father's store, and at one visit to J.'s apartment.
J. testified that B. possessed a photo album containing pictures of the child and himself which was kept in a closet so as not to embarrass R's relatives. B. testified that she was not aware of the existence of any such album. Even if the Court were to believe that such an album existed, it is puzzling and incredible that neither J. nor his relatives possessed even one duplicate of the pictures of himself with the child which he claims are contained in the album and which he could have obtained and presented to the Court.
The Court also finds that J.'s paternity claim is less than credible in view of his testimony that he did not attempt to obtain a copy of the child's birth certificate until after he filed his paternity petition.
J.'s testimony about his relationship with the child is somewhat credible, especially prior to and just after the birth of the child; however it is very clear that as the relationship with B. diminished over the past two years so also did J.'s relationship with the child. This is underscored by J.'s inconsistent testimony that he "was not fully aware" that the event to which he had been invited on June 8, 2006 was the child's second birthday party even though he claimed that he was still seeing the child four times a week.
[*15]
The Court also notes that the deterioration of the relationship between J. and B. is revealed by the disturbing and spiteful nature of J.'s testimony against B. In his sworn Affidavit dated September 12, 2006, J. alluded to her many character defects and referred to B. in a contemptuous manner. At the hearing, J. provided detailed testimony about an unsavory episode between B., his girlfriend, and himself at his apartment in June of 2006 to explain why he waited to file a paternity action; he made it a point to testify about an incident in 2005 involving an unfounded Child Protective Services allegation against B., even though this testimony undermined his case by revealing that he did not hold himself out to be the child's father to the investigator. J. even attempted to introduce vulgar photographs of B. into evidence to prove his assertion that there was an intimate relationship between the two. B., while considerably more restrained in her characterization of and testimony about J., also displayed anger and defensiveness. While the Court did not rely on the obvious hostility between the parties in its best interests analysis of the child, it does note that it would be very difficult after this proceeding for J. and B. to set aside their bitterness toward one another.
In the final analysis, however, it is the acts and omissions of J., and of him alone, that the Court looks to in determining the extent and nature of his relationship with the child. At one point in his testimony while describing a photo of the child's first birthday party, J. made a statement that sums up the Court's impression of his overall relationship with the child, "I was right there in the background."
Based upon J.'s own testimony, B. permitted him to have unfettered access to the child for the first two year's of the child's life. During this time period, J. could have formed an open, father-son relationship before the public, but he chose not to do so. He could have assumed financial responsibility for the child, but he chose not to do so. He could have taught the child to look upon him as his father, but he chose not to do so. He could have applied for a legal [*16]adjudication of his parental rights, but he chose not to do so. Instead, he acquiesced in the formation of a father-son bond between R. and the child.
R. very credibly testified that he has been a daily presence in the child's life since the birth of the child. He testified that the child has lived with his wife and him since birth and that he is the sole financial provider for the family for necessaries such as shelter, food, and clothing. R. presented extremely credible evidence that the child and B. are covered by his health insurance policy and that he has paid for all of the uncovered expenses attendant on his wife's pregnancy, the birth of the child, and the child's current health care. He also testified that he and his wife made the decision about the child's religion.
Significantly, R. testified that he loves the child and that he holds him out to be his son openly. He further testified that the child knows him as his father. The credible testimony of a third party, P., corroborates the father-son interactions between R. over a lengthy period of time and is considered very reliable by the Court. B.'s very credible testimony regarding the nature and extent of R's relationship with the child is also fully documented in a series of photos which depict him and the child celebrating special events such as vacations and holidays as well as routine parental acts such as visits to the farm, father/son haircuts, and so on.
Based upon his own testimony, J. has not provided any significant financial support for the child's current or future needs. In contrast, R. has established a college fund for the child and has named the child as beneficiary on an insurance policy.
Based on the foregoing analysis, the Court also finds that the child's interest in knowing with certainty the identity of his biological father is outweighed by the benefit of preserving the existing, loving relationship with R., who is the man the child knows as and calls his father. There is also benefit to the child in preserving his legitimacy as the child was born during B.'s and R.'s marriage. (Catherine A. v. David B., 249 AD2d 964.) Indeed, according to J.'s[*17]
testimony, both B. and R. told him that they plan to continue their marriage and there is no contradictory evidence before the Court.
The Court makes no specific finding with respect to whether DNA testing would have a traumatic effect on the child as there was no evidence presented on this topic. However, the Court recognizes decisional law which holds that "destroying a child's image of her family would be catastrophic and frought [sic] with lasting trauma." (Ettore I. v. Angela D., 127 AD2d 6, supra.) The Court also finds that J. did not present evidence demonstrating how it would benefit the child to order a DNA test. (Sharon GG v. Duane HH, 95 AD2d 466, supra.)
Accordingly, this Court finds that the nature and extent of J.'s relationship with the child was not parental in nature or stature and that J. did not meet his burden of showing why he should not be estopped from pursuing his paternity claim. (James BB. v. Deborah AA., 202 AD2d 852.)
The Court notes that the doctrine of equitable estoppel can be overcome if it is in the best interests of a child in a disputed paternity action. (Cleophous P., Jr. v. Latrice M.R., 299 AD2d 936). However, the Court finds that it is not in the best interests of this child to go forward with DNA testing or the paternity petition based on the findings recited above.
Accordingly, the Court invokes the doctrine of equitable estoppel to protect the best interests of the child and grants the motions of the respondent and the Law Guardian to deny DNA testing and to dismiss the paternity petition. Therefore, it is hereby
ORDERED, that the petitioner's request for a directed verdict is denied; and it is further
ORDERED, that the paternity petition is dismissed with prejudice.